# 11-3474

*To Be Argued By*:
DANIEL A. SPECTOR

---

# United States Court of Appeals

## For the Second Circuit

◆ ◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

ROBERT CATOGGIO, DONALD MESSINGER, BARRY MIELE, ALAN KOOP, MARCELO QUINTERO, MICHAEL TROCCHIO, DOMINICK FRONCILLO, STEPHEN AGNESE, ARTHUR ALONZO, JOHN ASARO, RANDY ASHENFARB, ROCCO BASILE, WILLIAM JOSEPH BATTISTA, MICHAEL A. BENGEN, JOHN BESARANY, NICHOLAS BOSCO, FABIO BORGOGNONE, NEIL BRAUNER, NICHOLAS BRIGANTI, RONALD CATAGGIO, ANTHONY CAVICCHIO, JOHN CLAUDINO, DAMON GERARD COHEN,

(*caption continued on inside cover*)

---

**On Appeal From The United States District Court
For The Eastern District of New York**

---

### BRIEF AND APPENDIX FOR THE UNITED STATES

---

LORETTA E. LYNCH,
*United States Attorney,*
*Eastern District of New York.*

DAVID C. JAMES,
DANIEL A. SPECTOR,
*Assistant United States Attorneys,*
*Of Counsel.*

WILLIAM COSIDENTE, RONALD CROPPER, JR., JOSEPH DIBELLA, DAVID DUNHAM, JONATHAN DURINDA, RUI REIS FIGUEIREDO, ROBERT FIGUEROA, VITO GILI, VALERY GOLDBERG, GREGORY GROELLER, THOMAS GUCCIARDO, JOHN LEMBO, III, RICO LOCASCIO, BRENT CALDERONE LONGO, MARK MANCINO, PAUL MEDAGLIA, CHRISTOPHER L. MIANO, VINCENT MINERVA, CHRISTOPHER MORMANDO, JAIME SCOTT MORRILL, JOEL NAZARENO, VITO PADULO, MICHAEL PERRINE, SCOTT PICCININNI, also known as SCOTT PALMER, also known as SCOOTER, FRANK J. PIZZOLATO, also known as FRANKIE THE FISH, THOMAS PLAMENCO, JOSEPH ROSETTI, KEITH RUFFLER, KIRK RUFFLER, MICHAEL SCARAMELLINO, JOSEPH SCARFONE, JR., RICHARD SCARSELLA, PAUL TAHAN, JEFFREY VAN BLARCOM, VICTOR VERNACI,

*Defendants,*

ROY AGELOFF,

*Defendant-Appellant.*

i

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT.. . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . 3

    I.   Ageloff's Criminal Conduct. . . . . . . . . . . . . 3

    II.  Indictment, Plea, and Sentencing. . . . . . . . . . 5

    III. The First Appeal. . . . . . . . . . . . . . . . . . 8

    IV.  Proceedings Following Remand. . . . . . . . . . . 12

    V.   Ageloff's Florida Prosecution.. . . . . . . . . . 15

    VI.  Proceedings Following Ageloff's Florida Conviction. 16

        A.   Ageloff's Change of Counsel. . . . . . . . . 16

        B.   Ageloff's Applications.. . . . . . . . . . . 18

        C.   Ageloff's Entitlement to CJA Funds.. . . . . 21

        D.   Ageloff's Return to Florida . . . . . . . . . 23

    VII. The District Court's Decision.. . . . . . . . . . 23

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . 31

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . 32

POINT ONE:

    THE DISTRICT COURT WAS NOT REQUIRED TO
    HOLD A TESTIMONIAL HEARING ON RESTITUTION. . . . . . . . 32

POINT TWO:

    AGELOFF'S RIGHT TO A SPEEDY
    SENTENCING WAS NOT VIOLATED. . . . . . . . . . . . . . . 40

POINT THREE:

      THE DISTRICT COURT PROPERLY DENIED
      AGELOFF'S MOTION FOR RELEASE OF FUNDS. . . . . . . . . . 47

POINT FOUR:

      THE DISTRICT COURT PROPERLY DENIED
      AGELOFF'S REQUESTS FOR CJA FUNDS FOR
      A FORENSIC ACCOUNTANT AND AN INVESTIGATOR. . . . . . . 51

POINT FIVE:

      THERE IS NO BASIS FOR REASSIGNMENT.. . . . . . . . . . 55

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . 59

TABLE OF AUTHORITIES

Cases

Page

In re Adler Coleman Clearing Corp.,
247 B.R. 51 (Bankr. S.D.N.Y. 1999). . . . . . . . . . . 37

Ageloff v. United States,
540 U.S. 939 (2003).. . . . . . . . . . . . . . . . . 13

Barker v. Wingo,
407 U.S. 514 (1972).. . . . . . . . . . . . . . . . . 42

Brady v. Maryland,
373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . 19

Chang v. United States,
250 F.3d 79 (2d Cir. 2001). . . . . . . . . . . . . . 33

Mathews v. Eldridge,
424 U.S. 319 (1976).. . . . . . . . . . . . . . . . . 34

United States v. Ageloff,
809 F. Supp. 2d 89 (E.D.N.Y. 2011). . . . . . . . . . passim

United States v. Awadallah,
436 F.3d 125 (2d Cir. 2006).. . . . . . . . . . . . . 55

United States v. Bradley,
812 F.2d 774 (2d Cir. 1987).. . . . . . . . . . . . . 55

United States v. Carmona,
873 F.2d 569 (2d Cir. 1989).. . . . . . . . . . . . . 34

United States v. Catoggio,
326 F.3d 323 (2d Cir. 2003).. . . . . . . . . . . . . passim

United States v. Durant,
545 F.2d 823 (2d Cir. 1976).. . . . . . . . . . . . . 51

United States v. Eisen,
974 F.2d 246 (2d Cir. 1992).. . . . . . . . . . . . . 34

United States v. Grabina,
309 F.2d 783 (2d Cir. 1962).. . . . . . . . . . . . . 45

United States v. Gushlak,
2011 WL 782295 (E.D.N.Y. Feb. 24, 2011).. . . . . . . 36

United States v. Hammad,
  902 F.2d 1062 (2d Cir. 1990). . . . . . . . . . . . . . . .  49

United States v. Hatfield,
  2010 WL 4235815 (E.D.N.Y. Sept. 27, 2010).. . . . . . . . .  48

United States v. Lovasco,
  431 U.S. 783 (1977)). . . . . . . . . . . . . . . . . . . .  43

United States v. Maurer,
  226 F.3d 150 (2d Cir. 2000).. . . . . . . . . . . . . . . .  34

United States v. Monsanto,
  924 F.2d 1186 (2d Cir. 1991). . . . . . . . . . . . . . . .  47

United States v. Numisgroup International Corp.,
  169 F. Supp. 2d 133 (E.D.N.Y. 2001).. . . . . . . . . . 48, 49

United States v. O'Neil,
  118 F.3d 65 (2d Cir. 1997). . . . . . . . . . . . . . . . .  57

United States v. Oliver,
  626 F.2d 254 (2d Cir. 1980).. . . . . . . . . . . . . . . .  51

United States v. Paul,
  634 F.3d 668 (2d Cir. 2011).. . . . . . . . . . . . . . . .  29

United States v. Prescott,
  920 F.2d 139 (2d Cir. 1990).. . . . . . . . . . . . . . . .  33

United States v. Ray,
  578 F.3d 184 (2d Cir. 2009).. . . . . . . . . . . 29, 43, 45

United States v. Robin,
  553 F.2d 8 (2d Cir. 1977).. . . . . . . . . . . . . . . . .  55

United States v. Ross,
  1993 WL 427415 (S.D.N.Y. Oct. 15, 1993).. . . . . . . . . .  48

United States v. Sabhnani,
  599 F.3d 215 (2d Cir. 2010).. . . . . . . . . . . . . . 33, 34

United States v. Sanchez,
  912 F.2d 18 (2d Cir. 1990). . . . . . . . . . . . . . . . .  51

United States v. Schultz,
  431 F.2d 907 (8th Cir. 1970). . . . . . . . . . . . . . . .  51

United States v. Simmons,
  2008 WL 336824 (E.D. Wis. Feb. 5, 2008).. . . . . . . . . . 48

United States v. Slevin,
  106 F.3d 1086 (2d Cir. 1996). . . . . . . . . . . . 33, 34, 35

United States v. Smith,
  987 F.2d 888 (2d Cir. 1993).. . . . . . . . . . . . . . 52

United States v. Sullivan,
  2010 WL 5437243 (E.D.N.C. Nov. 17, 2010). . . . . . . . . 48

United States v. Tracy,
  12 F.3d 1186 (2d Cir. 1993).. . . . . . . . . . . . . . 34

United States v. Trzaska,
  859 F.2d 1118 (2d Cir. 1988). . . . . . . . . . . . . . 55

United States v. Yousef,
  327 F.3d 56 (2d Cir. 2003). . . . . . . . . . . . . . . 49

## Statutes and Rules

18 U.S.C. § 3006A.. . . . . . . . . . . . . . . . . . 51

18 U.S.C. § 3664. . . . . . . . . . . . . . . . . 40, 45

28 U.S.C. § 144.. . . . . . . . . . . . . . . . . . . 55

28 U.S.C. § 1651. . . . . . . . . . . . . . . . . . . 48

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . 33

Fed. R. Crim. P. 32.. . . . . . . . . . . . . . . 40, 45

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 11-3474

UNITED STATES OF AMERICA,

*Appellee*,

- against -

ROBERT CATOGGIO, DONALD MESSINGER, BARRY MIELE, ALAN KOOP, MARCELO QUINTERO, MICHAEL TROCCHIO, DOMINICK FRONCILLO, STEPHEN AGNESE, ARTHUR ALONZO, JOHN ASARO, RANDY ASHENFARB, ROCCO BASILE, WILLIAM JOSEPH BATTISTA, MICHAEL A. BENGEN, JOHN BESARANY, NICHOLAS BOSCO, FABIO BORGOGNONE, NEIL BRAUNER, NICHOLAS BRIGANTI, RONALD CATAGGIO, ANTHONY CAVICCHIO, JOHN CLAUDINO, DAMON GERARD COHEN, WILLIAM COSIDENTE, RONALD CROPPER, JR., JOSEPH DIBELLA, DAVID DUNHAM, JONATHAN DURINDA, RUI REIS FIGUEIREDO, ROBERT FIGUEROA, VITO GILI, VALERY GOLDBERG, GREGORY GROELLER, THOMAS GUCCIARDO, JOHN LEMBO, III, RICO LOCASCIO, BRENT CALDERONE LONGO, MARK MANCINO, PAUL MEDAGLIA, CHRISTOPHER L. MIANO, VINCENT MINERVA, CHRISTOPHER MORMANDO, JAIME SCOTT MORRILL, JOEL NAZARENO, VITO PADULO, MICHAEL PERRINE, SCOTT PICCININNI, also known as SCOTT PALMER, also known as SCOOTER, FRANK J. PIZZOLATO, also known as FRANKIE THE FISH, THOMAS PLAMENCO, JOSEPH ROSETTI, KEITH RUFFLER, KIRK RUFFLER, MICHAEL SCARAMELLINO, JOSEPH SCARFONE, JR., RICHARD SCARSELLA, PAUL TAHAN, JEFFREY VAN BLARCOM, VICTOR VERNACI,

Defendants,

ROY AGELOFF,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

Roy Ageloff appeals from an amended judgment of the

2

United States District Court for the Eastern District of New York (Dearie, J.) entered on September 14, 2011. Ageloff was convicted, based upon his plea of guilty, of one count of racketeering in violation of 18 U.S.C. § 1962(c). He was originally sentenced in 2001 to 96 months' imprisonment, three years of supervised release, $80 million in restitution and a $100 special assessment. On appeal, this Court vacated the restitution order and remanded. See United States v. Catoggio, 326 F.3d 323 (2d Cir. 2003). On remand, the district court ordered restitution in the amount of $190,339,436.65. See United States v. Ageloff, 809 F. Supp. 2d 89 (E.D.N.Y. 2011).

On the current appeal, Ageloff contends that (1) the district court erred in not holding a testimonial hearing concerning restitution, (2) the length of time the case was on remand violated his constitutional and statutory rights, (3) the district court improperly refused to release funds held by the clerk of the court so that Ageloff could retain counsel, (4) the court erred in not granting him funds under the Criminal Justice Act to hire a forensic accountant and a private investigator, and (5) if the case is remanded, it should be remanded to a different district court judge or defense counsel should be relieved.

For the reasons set forth below, Ageloff's claims lack merit and his sentence should be affirmed.

STATEMENT OF FACTS

## I.  Ageloff's Criminal Conduct

Roy Ageloff, together with his partner, Robert Catoggio, was the leader of one of the nation's largest "pump-and-dump" securities fraud schemes.  The district court described the schemes orchestrated by Ageloff and his co-conspirators as "massive, aggressive, and extremely lucrative."  Ageloff, 809 F. Supp. 2d at 91.  From 1991 to 1998, Ageloff and Catoggio owned and controlled four brokerage firms, Hanover, Sterling & Co., Ltd., Norfolk Securities Corp., PCM Securities, Limited, L.P., and Capital Planning Associates, Inc.  Ageloff and Catoggio and dozens of brokers at these firms defrauded the firms' customers in connection with the purchase and sale of different "House Stocks."  (PSR ¶¶ 11-12).[1]

At all four firms that Ageloff and Catoggio controlled, the frauds followed a similar pattern: Ageloff and Catoggio acquired control over large blocks of stock and stock warrants of various small and start-up companies as well as companies that did no business at all (collectively, the "House Stocks").  They frequently acquired these House Stocks for little consideration, sometimes by paying kickbacks to principals of the House Stock issuers; on other occasions, the House Stock was obtained even more

---

[1]  "A" and "GA" refer to Ageloff's appendix, and the government's appendix, respectively.  "PSR" refers to the presentence report, which is being filed separately under seal.

4

cheaply, by stealing the stock from the issuer.  (PSR ¶ 13).

Having acquired the House Stocks, Ageloff and Catoggio created artificial market demand for them.  One technique they used to create such demand and to defraud consumers was to pay excessive undisclosed commissions to brokers at the brokerage firms that they controlled, based on the amount of the particular House Stock a broker sold to a consumer.  These commissions, which could be 20 to 30 percent of the price of the House Stock, encouraged brokers to tout aggressively the House Stock to the public.  Such commissions were not paid to brokers when selling non-House Stock to consumers or when buying House Stock from consumers.  Instead of disclosing these kickbacks to the public, which would discourage consumers from purchasing the stock at the artificially inflated purchase price, the brokers routinely informed their customers that a nominal or no commission would be charged.  (PSR ¶ 14).

Ageloff's brokerage firms also used high-pressure false and misleading sales pitches and scripts to convince consumers to purchase House Stock.  Brokers assured consumers that the price of the House Stocks would rise quickly and made exalted claims about the companies' business prospects, although the companies routinely did little or no business.  (PSR ¶ 16).

Ageloff and his co-conspirators artificially maintained the prices of House Stocks by a variety of techniques designed to insulate the House Stock from the adverse pressure of a lack of

5

market demand, which would have caused the stock price to collapse. These techniques included: (a) using high-pressure tactics and false and misleading statements to persuade customers not to sell House Stocks; (b) failing to take and to execute customer orders to sell House Stocks; and (c) executing a sale of a House Stock only if it could be "crossed" with a purchase of the same stock by another customer. None of these techniques was disclosed to consumers at the time of their purchases of the House Stock or thereafter because disclosure would reveal the undesirability of the House Stock and would thus result in the scheme's unraveling. (PSR ¶ 18).

II. <u>Indictment, Plea, and Sentencing</u>

Ageloff was one of 55 defendants indicted for participating in the scheme outlined above. He pleaded guilty pursuant to a plea agreement on August 17, 2001 to racketeering in violation of 18 U.S.C. § 1962(c). At the time of the guilty plea, Ageloff allocuted to four predicate racketeering acts charging separate conspiracies (in violation of 18 U.S.C. § 371) to commit securities fraud at each of the four above-mentioned brokerage firms.

Ageloff's plea agreement with the government included an estimate of the applicable Sentencing Guidelines calculation. The calculation, set forth in Paragraph 2 of the plea agreement, included an upward enhancement of 18 levels corresponding to a

fraud loss exceeding $80 million pursuant to U.S.S.G. § 2Fl.l(b)(1)(S) of the applicable 1997 Guidelines Manual. The loss figure of more than $80 million placed Ageloff's fraud in the highest bracket of loss under the Guidelines and thus a more precise estimate of the amount of loss would have been immaterial. As part of his plea agreement, Ageloff stipulated to this calculation. See Catoggio, 326 F.3d at 325; Ageloff, 809 F. Supp. 2d at 93.

The district court convened a pre-sentence conference on July 31, 2001, to determine the scope of disputed issues relevant to sentencing. Ageloff's counsel emphasized that, consistent with the plea agreement, Ageloff did not disclaim responsibility for at least $80 million in fraud losses. (A 54-55).[2] Instead of challenging the loss calculation directly, Ageloff pursued his downward departure motion on the grounds that the loss figure overstated his culpability. In response to the government's objection that Ageloff's departure motion was, in part, a challenge to the amount of the loss and, therefore, foreclosed by the plea agreement, at the pre-sentence conference, the district court

---

[2]    Moreover, Ageloff could not plausibly have contended that the combined fraud loss at his four brokerage firms was less than $80 million given that he settled a civil law suit with the trustee for Adler Coleman and Co., which served as Hanover's clearing firm, for $65 million. The losses suffered by Adler Coleman, which was bankrupted by Hanover's collapse, arose from a small portion of Hanover's fraudulent sales and did not include any subsequent fraud losses at the other firms. (A 62). See generally In re Adler Coleman Clearing Corp., 263 B.R. 406 (S.D.N.Y. 2001).

sought and received clarification from defense counsel that Ageloff did not challenge the computation of the applicable fraud loss to be at least $80 million.  (A 56).

On the subject of restitution, Ageloff contended (after counsel at sentencing withdrew prior counsel's motions) only that restitution was discretionary rather than mandatory because Ageloff's conduct occurred before, as well as after, the April 24, 1996, effective date of the mandatory restitution provisions of 18 U.S.C. § 3663A, commonly referred to as the Mandatory Victim Restitution Act ("MVRA").

At the sentencing on August 15, 2001, the only disputed issue with respect to restitution was the payment schedule.  The amount of restitution was not in dispute.  At the conclusion of the sentencing hearing, the district court imposed a sentence of 96 months' imprisonment, three years' supervised release, a $100 special assessment and $80 million in restitution.  The court held Ageloff jointly and severally liable with Catoggio for the full amount of the restitution.  As a payment schedule, the court ordered Ageloff to pay $500,000 within 30 days of sentencing, another $500,000 within 30 days of his release from prison, and $10,000 per month thereafter as a condition of supervised release, subject to modification based on periodic financial disclosure. (A 22, entry 1207); see also Catoggio, 326 F.3d at 326 (describing district court's sentence and payment schedule).

8

With respect to the identities of the fraud victims and the amount of loss suffered by each one, the PSR stated, "Due to the thousands of victims affected by the defendants' conduct, it would be impractical to request Affidavits of Loss from each victim, but it is noted that the Government is in possession of trading records which identify the victims and their respective losses." (PSR ¶ 36). Following the imposition of sentence, Ageloff (through counsel) placed on the record his consent to permitting the government to submit the required victim information to the court at a date beyond the 90 days otherwise required by 18 U.S.C. § 3664(d)(5). (GA 6); see also Catoggio, 326 F.3d at 325 (noting Ageloff's waiver of 90-day requirement of 18 U.S.C. § 3664(d)(5)).

The sentence imposed by the district court was set forth in a judgment dated August 24, 2001, which incorporated an attached restitution order. The order provided in relevant part:

> By consent of the parties, the names of the victims to whom restitution is owed and the losses sustained by each individual victim will be set forth in a separate Order of the Court at such time, which may exceed 90 days from the date of this Order, as that information can be ascertained by the Court, on notice to the defendant, based on a proposal that shall be submitted by the United States Attorney.

Catoggio, 326 F.3d at 325-26.

III. The First Appeal

Ageloff, represented by new counsel, appealed the order

of restitution, raising several claims.  First, he contended that restitution was improperly awarded under the MVRA because (1) the government had not identified any specific victims, (2) the number of victims was too large for restitution to be practicable, and (3) the factual issues were so complex that the burden on the sentencing process outweighed the need for restitution.  Second, he contended that the restitution amount of $80 million did not represent the amount of losses actually suffered by any victims. Third, despite his waiver at sentencing, he contended that all issues regarding restitution were required to be resolved within 90 days.  Fourth, he contended that the restitution schedule set by the district court failed to consider his financial situation adequately.

On April 16, 2003, this Court vacated the order of restitution and remanded for further proceedings.  Catoggio, 326 F.3d at 323.  The Court rejected all but one of Ageloff's arguments.  First, it ruled that Ageloff's victims could be identified from trading records.  It noted the government's representation that, while the case was on appeal, the government had submitted a 1700-page victim restitution report which detailed $192 million in losses to approximately 10,000 victims.  Id. at 328.  Second, it rejected Ageloff's claim that the complexities of awarding restitution outweighed the burden on the sentencing process.  The Court noted that, to the contrary, the district court

10

did not consider ordering restitution to be too burdensome and in fact "considered restitution an essential part of Ageloff's sentence." Id. Third, the Court rejected Ageloff's argument that the district court had failed to consider his financial situation in setting the payment schedule. Id.

The Court, however, did agree with Ageloff that the district court had erred "in ordering restitution to unidentified, as opposed to unidentifiable, victims and in an amount ($80 million) that may not represent the actual losses to those victims." Id. The Court noted that "[i]dentification of victims is a statutory prerequisite to the application of the MVRA" and that "identifying victims prior to imposing restitution ensures that those victims receive the pro-rata share of the restitution funds to which they are entitled." Id. The Court also observed that "the MVRA also requires courts to order restitution in the full amount of the victims' losses" and that "neither the parties nor the district court below believed the $80 million figure was an accurate statement of the victims' losses in this case." Id. at 329. Indeed, the $80 million restitution figure was based upon the estimated amount of loss in Ageloff's plea agreement, which estimate was set forth for the purpose of setting his offense level under the Sentencing Guidelines. The Court noted, "Not only might this number not represent actual losses for restitution purposes, but by explicitly agreeing to the highest enhancement, Ageloff

admitted to causing losses <u>exceeding</u> $80 million." <u>Id</u>. (citation omitted, emphasis in original).

Finally, the Court rejected Ageloff's argument that it should simply vacate the restitution order without remanding for further proceedings because 18 U.S.C. § 3664(d)(5) requires restitution to be imposed within 90 days of sentencing -- a deadline that had already passed. The Court noted that Ageloff could not show prejudice from the failure to meet the 90-day deadline where he had consented to the delay with the advice of counsel. <u>Id</u>. at 330. Further, the Court noted that "the intent behind the 90-day period was not to protect defendants, but rather to protect victims from the willful dissipation of a defendant's assets," and thus "Ageloff's attempt to invoke this provision in order to avoid paying restitution to the victims of his crime is unavailing." <u>Id</u>.

The Court accordingly vacated the restitution order and remanded for resentencing on restitution. The Court noted the government's representation that "proceedings to determine the victims and their actual losses are currently under way in the district court" and that "the district court should simply incorporate the findings from those proceedings into a new restitution order." <u>Id</u>. The Court also directed that, "in view of the time that has elapsed since Ageloff's initial sentencing," the district court should "schedule a sentencing hearing on restitution

12

forthwith." Id.

IV.  Proceedings Following Remand

The Court's mandate issued on May 21, 2003.  On June 4,
2003, Ageloff asked the district court for a stay of the
restitution proceedings until the Supreme Court ruled on his
certiorari petition.  (A 28, entry 1359).

On July 11, 2003, the government provided the district
court with an update of the status of the restitution proceedings.
(A 84).  The government reported that, in June 2002, it had filed
a report prepared by the National Association of Securities Dealers
("NASD") using electronic "blue sheets" that reflected the
purchases and sales of the House Stocks promoted by Ageloff and his
co-conspirators.  The report was 1,718 pages long and identified
more than 9,000 victims who suffered a loss of $192,119,571.65.
The government had provided a copy of the report to Ageloff, who
was then pro se.[3]  Although the court had given defendants 60 days
to lodge objections to the report, Ageloff was granted additional
time to respond.  In October and November of 2002, Ageloff filed a
series of pro se objections to the report.  None of the other
defendants in the case objected to the report.  (A 85).

_____

[3]     Ageloff at the time was represented by counsel in
connection with his pending appeal as well as by separate counsel
in related civil proceedings.  However, both of these attorneys
told the government that they were not authorized to represent
Ageloff in connection with the restitution proceedings in district
court.  (A 86).

13

The government noted that, because Ageloff was pro se and incarcerated in Florida, "it has not been possible for the parties informally to address, narrow or resolve any of Ageloff's objections." (A 86). The government then responded to the pro se objections Ageloff had raised. (A 87-91). The government also responded to Ageloff's requests for discovery. It noted that "[m]ost of the documents that the defendant seeks, if they exist at all, are not in the government's possession." (A 91). It further noted that the NASD's report was generated from an electronic database that was "too massive to be printed or even viewed in its entirety on a computer." (A 91). Although acknowledging that "it is unlikely that Ageloff could make use of the database in prison," the government offered to send it to him on a CD-ROM, assuming that he had not retained new counsel in the meantime. (A 92).

In conclusion, the government asked the court to deny Ageloff's motion to stay the restitution proceedings pending his certiorari petition, permit Ageloff "a reasonable period to reply to this submission," and "schedule a status conference for a future date for which the defendant will be transferred from prison in order to appear in person (unless counsel is retained and requests otherwise)." (A 92).

The Supreme Court denied certiorari in Ageloff's case on October 6, 2003. Ageloff v. United States, 540 U.S. 939 (2003). On May 17, 2004, more than seven months after the denial of

14

certiorari and nearly a year after the issuance of this Court's mandate, Joel Hirschhorn, Esq., entered a notice of appearance for Ageloff in the district court. (A 28, entry 1409). Mr. Hirschhorn was the same attorney who had represented Ageloff at the original sentencing but who had withdrawn as counsel while the case was on appeal. Mr. Hirschhorn's partner, Brian Bieber, Esq., subsequently appeared in the case on Ageloff's behalf.

The next entry on the docket sheet occurred on August 17, 2007, when the district court ordered a status conference. (A 28, entry 1474). The court acknowledged that "I and a few others have dropped the ball on this remand" and that "the open issue is identification of the victims." (GA 14-15). Defense counsel stated that "at least two years ago," he and the prosecutor previously assigned to the case had "spoken several times about the issue of identification of the victims to come to or try to come to an agreeable amount." (GA 15). Counsel asserted that he had been "waiting to hear back" from the former prosecutor but had recently had several conversations with the newly-assigned prosecutor concerning a potential resolution of the case. (GA 15-16). The parties agreed that they would need additional time for further discussions, although defense counsel noted that he was not waiving his timeliness objections. (GA 16-17). The court scheduled another status conference for October 26, 2007.

On October 22, 2007, Ageloff filed a motion "to vacate

15

restitution order." (A 75). That motion asserted that Ageloff had not been provided with the results of the "proceedings to determine the victims and their actual losses" that this Court had referred to in its opinion remanding the case. (A 78). Ageloff further asserted the government had done "nothing regarding the restitution Order after the Second Circuit issued its April 16, 2003 opinion" and specifically had not provided him with a list of identifiable victims. (A 78-79). These assertions were false. As noted before, the government had in fact provided Ageloff with a 1,718-page report in June 2002 that listed the thousands of victims of Ageloff's fraud. (A 85). Further, less than two months following this Court's remand, the government had addressed all of Ageloff's discovery requests and objections to the report. (A 87-92).

At status conferences on October 26 and December 19, 2007, the parties reported to the district court that they were attempting to work out a disposition to resolve the restitution issue. (A 29, entries 1479 and 1483). However, no agreement was consummated.[4]

V.   Ageloff's Florida Prosecution

On May 21, 2008, Ageloff was indicted in the Middle

_____

     [4]   While defense counsel reported that the parties had reached an agreement on the restitution amount on December 26, 2007 (A 231), the government subsequently concluded that any agreement that awarded the victims less than the full amount of their losses would be inconsistent with this Court's opinion. See Catoggio, 326 F.3d at 329 ("the MVRA also requires courts to enter restitution in the full amount of the victims' losses").

16

District of Florida on one count of conspiracy to commit money laundering (the "Florida case"). The indictment charged that between November 2001 and October 2003, while Ageloff was incarcerated at the Federal Correctional Complex at Coleman Florida, Ageloff and his brother, Michael Ageloff, conspired to launder millions of dollars in proceeds of the crimes for which he was convicted in this case. On January 8, 2009, Ageloff pled guilty to the money laundering conspiracy charge. At his sentencing on July 22, 2009, Ageloff specifically admitted that he had attempted to launder proceeds from the offense in this case. (A 273). The district court imposed a 60-month prison sentence to run consecutively to the 96-month sentence imposed in this case. Ageloff's appeal of his sentence in the Florida case was dismissed by the Eleventh Circuit on July 27, 2010. (A 379).

VI.  Proceedings Following Ageloff's Florida Conviction

A.  Ageloff's Change of Counsel

Following Ageloff's guilty plea in Florida, the government wrote the district court on February 24, 2009, enclosing a copy of its July 11, 2003 letter and another copy of the disc containing the names, last known addresses, and loss amounts for the 10,500 victims in this case. The government noted that this disc had originally been filed in 2002. (A 82).

On March 4, 2009, defense counsel reported to the court, inter alia, that he was in the process of contacting Ageloff to

17

determine whether Ageloff wanted counsel to continue to represent him.  (A 231).  On March 24, 2009, Mr. Bieber moved to withdraw from the case, stating that Ageloff no longer wished Bieber to represent him.  (GA 20).  The court granted that motion on March 27, 2009.  (A 29, entry 1518).

On June 25, 2009 and August 13, 2009, Ageloff filed <u>pro se</u> motions for the appointment of counsel under the Criminal Justice Act ("CJA").  (GA 22, 26).  The motions did not assert that Ageloff could not afford to pay for counsel but merely stated that "[w]ithout competent counsel Ageloff stands to be substantially prejudiced and lose significant rights."  (GA 26).

The court held a status conference on September 22, 2009. The prosecutor attended and Mr. Bieber appeared by telephone. Ageloff, who was incarcerated in Florida in connection with the Florida case, did not appear.  The prosecutor reported that Ageloff was no longer needed in Florida in connection with his criminal case there and could be brought to New York so that the restitution proceedings could be concluded.  (A 94).  The prosecutor also stated that the government's July 2003 letter had responded to Ageloff's <u>pro se</u> objections to the restitution report and that "it's our position that the court should rule on the objections and should impose the full restitution amount."  (A 94-95).  Mr. Bieber, who had been relieved as Ageloff's retained counsel six months earlier, asked to be appointed to represent Ageloff, subject

18

to Ageloff's approval. (A 97-98). The court indicated its willingness to appoint Mr. Bieber and observed that "[n]ow that we've identified these victims, it seems to me it should be . . . a simple matter of computing the losses and giving Mr. Ageloff an opportunity to tell us how the government is wrong." (A 98). However, at a status conference on November 20, 2009, Ageloff indicated that he did not want Mr. Bieber to represent him and requested the appointment of new counsel. (A 102). The court agreed to that request. (A 102).

B.    Ageloff's Applications

At a status conference on December 2, 2009, Ageloff appeared with his newly-appointed counsel, Scott Fenstermaker, Esq. The government again noted that Ageloff had filed pro se objections to the government's proposed restitution order and that "all that's left, really, is for the Court to rule on the objections and enter a restitution order." (A 103.3). The court adjourned the matter until the following month to allow new counsel to become familiar with the case.

In the weeks and months that followed, defense counsel made a series of filings seeking a variety of relief.

First, counsel sought extensive discovery from the government, including, inter alia, contact information and "customer or investor statements reflecting the complete account history" for each of the approximately 10,000 investors for whom

the government sought restitution.  (A 109-26, 195-96).

Second, counsel requested approval from the court for CJA funds for forensic accounting services (A 143, 161, 183, 186, 189), a private investigator (A 183, 189), a second CJA attorney or a full-time paralegal (A 270) and the cost of subpoenaing 31,000 documents from Financial Industry Regulatory Authority (A 270).

Third, counsel moved to vacate the 2001 restitution order and dismiss the resentencing proceedings on "speedy sentencing" grounds.  (A 188-89).

Fourth, Ageloff made what counsel termed "a criminal version of a motion for summary judgment," seeking a ruling as a matter of law that the government could not meet its burden of proof as to any amount of restitution.  (A 150, 189).

Fifth, counsel sought an evidentiary hearing that he predicted would last "at a minimum, three months, if we work five days a week."  (A 269).  Counsel also reported that Ageloff had "at least 31,000 documents he anticipates presenting in his defense" at this hearing.  (A 269).

Sixth, Ageloff disputed that his guilty plea to money laundering in Florida had "resulted from his attempt to hide the proceeds of his New York criminal activity."  (A 160).

Seventh, Ageloff moved to withdraw his guilty plea in this case, contending that the plea was obtained in violation of his rights under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and his

Sixth Amendment right to counsel.  (A 297-98).

Eighth, on April 29, 2010, Ageloff filed a petition for a writ of mandamus with this Court, seeking an order directing the district court to rule on his motion to vacate the restitution order, his application for the appointment of an expert witness and investigator, and his motion to dismiss the restitution proceeding. In re Roy Ageloff, No. 10-1598.  The Court denied the petition on May 28, 2010.

The government responded to Ageloff's various applications in district court.  With respect to discovery, the government contended that the information sought had either already been provided to Ageloff or was irrelevant.  (A 128-29).  It provided the court with transcripts of Ageloff's plea and sentencing in the Florida case, which refuted Ageloff's assertion that his money-laundering conviction was not based on his attempt to launder the proceeds of the fraud in this case.  (A 272-73). With respect to Ageloff's arguments and discovery requests about loss causation, the government pointed out that the court had ruled on that question at Ageloff's original sentencing and that relitigation of the issue was beyond the scope of this Court's mandate.  (A 273-74).  The government argued that the narrow issue before the district court was "whether the investor names have been correctly compiled, and whether their loss figures have been correctly added together."  (A 274).  Finally, it argued that

21

Ageloff's motion to dismiss the restitution proceeding on "speedy sentencing" grounds was without merit because Ageloff himself was responsible for much of the delay and, in any event, the claim was foreclosed by this Court's prior decision.  (A 274-75).

C.    Ageloff's Entitlement to CJA Funds

    The district court had scheduled an evidentiary hearing on restitution for May 17, 2010.  However, on May 11, 2010, the court held a status conference to discuss Ageloff's entitlement to CJA funds.  The court noted that it had "always had some concerns about whether or not Mr. Ageloff qualifies for court appointed counsel."  (A 284).  The court explained that, "in the hope of moving quickly given all the delays," it had appointed counsel but that it had been "second guessing" this decision for some time. (A 284).  The court further noted that it could not find a financial affidavit from Ageloff in the case file.  (A 286).  What triggered the court's most recent concern was disclosure of the transcripts in Ageloff's Florida case showing the connection between Ageloff's money laundering activities and the fraud in this case.  (A 284).  In light of Ageloff's elaborate efforts to hide the proceeds of his fraud, the court had developed "a very serious question . . . as to whether or not public funds ought to be spent in representing Mr. Ageloff's interest in the proceedings as per the mandate of the circuit."  (A 284-85).

    The court held an evidentiary hearing on Ageloff's

entitlement to CJA funds on June 1, 2010. Ageloff testified that he had been incarcerated since 2001 and had earned $300,000 to $400,000 in interest between 2001 and 2008, all of which had gone to support his family. (GA 35). He claimed to have no assets other than an insurance policy that had been liquidated and placed in trust for his children and some personal property being held in storage on Long Island. (GA 35-38, 49-50). In Ageloff's Florida case, he had wanted to retain counsel but could not obtain release of the funds that had been seized. (GA 38-44, 45-47). He was therefore represented by CJA counsel in district court. (GA 44-45). On appeal, Ageloff was initially represented by appointed counsel, who filed an "<u>Anders</u>" brief, but Ageloff later retained an appellate attorney whose $22,000 fee was paid by Ageloff's cousin and by two of Ageloff's friends that Ageloff identified as Scott Smilon and "Joe." (GA 47-49).

On cross-examination, Ageloff claimed that he had known Joe since 1994 but could not recall his last name. (GA 51-52, 54). Ageloff also testified that Joe had possession of a 1986 Porsche belonging to Ageloff that Joe was helping to repair so that it could be sold. (GA 52-54). Ageloff admitted that the money he was convicted of laundering in Florida included $3.5 million that he had loaned to a company called Cutting Edge Entertainment. (GA 60-62). He did not know whether the government had seized all of that $3.5 million. (GA 62-63). Ageloff also identified several people

who owed him substantial sums of money.  One John Trovato owed him
$125,000.  (GA 73).  Ageloff's former partner, David Glasser, owed
him "several million dollars."  (GA 73-74).  And an attorney named
Robert Boudry owed him "about a million dollars."  (GA 74).
Ageloff had brought litigation to recover some of these funds, but
some of his claims had been dismissed on statute-of-limitations
grounds.  (GA 77).

      D.   <u>Ageloff's Return to Florida</u>

On July 7, 2010, Ageloff wrote the district court
requesting that the court satisfy the writ of habeas corpus <u>ad
prosequendum</u> that had brought him to New York and allow him to be
returned to federal prison in Florida.  Ageloff expressly "waive[d]
the right to be physically present for future sentencing
proceedings."  (GA 84).  The district court so-ordered Ageloff's
request on July 23, 2010.  (A 35, entry 1592).

VII. <u>The District Court's Decision</u>

On August 19, 2011, the district court issued a
memorandum and order finding Ageloff responsible for
$190,339,436.65 in restitution.  <u>Ageloff</u>, 809 F. Supp. 2d at 89.
The court observed that, under this Court's decision in <u>Catoggio</u>,
its "task here is an exceedingly limited one: to compile, and then
incorporate into a supplemental restitution order, a list of the
names of actually identified victims and the total loss that each

victim suffered." Id. at 95.  With minor exceptions,[5] the court

accepted the 1,718-page report from the NASD of the victims and

their losses.  The court noted that the report was based upon

electronic "blue sheet" data, "which reflect the actual purchase

and sale by the victims of the fraud of the various brokerage

firms' house stocks." Id. at 98.

The court rejected all of Ageloff's objections to the

restitution report.  It noted that this Court had rejected

Ageloff's argument that restitution was inappropriate in this case

because "determining the victims' losses [is] so complex that the

need for restitution was outweighed by the burden on the sentencing

process." Id. at 98-99 (quoting Catoggio, 326 F.3d at 327)

(alteration in Ageloff).  The court observed:

> I read most of Ageloff's objections to the
> Restitution Report as an effort to refuel that
> position by manufacturing complexity in the
> hope that I might, at this late date, wave the
> white flag and decide that the matter of
> restitution is too complex or too much of a
> burden on the system after all.  It is
> neither.  Indeed, it would be an
> unconscionable injustice to grant such a
> windfall to the architect, engineer and
> enforcer of a massive fraud that injured so
> many thousands of investors and netted him
> many millions of dollars, and who has already
> resorted to additional criminal conduct (the
> Florida conviction) to avoid the financial

---

[5]     The court reduced the total amount of restitution by
$1,780,135 to eliminate a loss from Ageloff's own account that was
mistakenly included in the total of $192,119,571.65 set forth in
the original restitution report.  See Ageloff, 809 F. Supp. 2d at
98 n.5.

25

consequences of his crime.

Id.  The court also noted that the MVRA did not require proof
beyond a reasonable doubt concerning the amount of losses.

> [I]f it did, the capacity of a defendant with
> Ageloff's resolve to avoid restitution would
> hold   a   restitution   order   hostage,   in
> perpetuity,  to  alarmist  attacks  that  the
> defendant  himself  is  in  the  best  position  to
> disprove,  and  eventually  to  the  pettiest  of
> objections,  perhaps  on  the  scale  of  nickel-
> and-dime  quarrels  about  amounts  and  specious
> challenges  to  a  surname  here  or  an  address
> there.   The  standards,  consistent  with  the
> purposes  of  the  MVRA,  require  only  reasonable
> estimates  arrived  at  by  a  preponderance  of  the
> evidence.   A  fortiori,  absolute  precision  is
> not required.

Id. at 103-04.  Indeed, under the MVRA, "some degree of estimating
must outweigh the certainty of allowing a thief to walk away with
his ill-gotten gains."  Id. at 104.

With regard to Ageloff's specific objections, the court
first  rejected  Ageloff's  contention  that  loss  figures  for
purchasers  of  unsold  shares  of  Hanover  Sterling's  House  Stocks
should be offset by the residual value these stocks allegedly had
for a short time after Hanover Sterling closed.

> Consistent  with  my  remarks  at  prior
> proceedings  in  this  case  and  based  upon  the
> evidence  adduced  at  the  trial  of  Ageloff  co-
> defendants  Nazareno  and  Plamenco,  I  find  that
> the  house  stocks  in  question  were  essentially
> worthless  because  the  companies  themselves
> were  worthless,  and  that  the  appropriate
> measure  of  loss  to  each  victim  who  was  induced
> to  make  a  sham  investment  is  the  amount
> invested  (i.e.,  the  purchase  price  of  the
> house shares).  See also Catoggio, 326 F.3d at

325 (noting that, according to the Presentence
Report, "many of the [house stock] companies
did little or no business"). Whether certain
of these shares may have [had] some
theoretical residual paper value for a short
period of time, and whatever that short-lived
value may have been, are not material concerns
for restitution purposes. Any possible de
minimis residual value the stocks may briefly
have had as a byproduct of continuing trading
activity during the market's digestion of
Hanover's collapse is not evidence of actual
value or measurable offset.

Id. at 100 (alteration in Ageloff).

The court next rejected Ageloff's objection that the
restitution report overstated total losses because it allegedly
contained fictitious trades made by brokers at Hanover Sterling
that were designed to create a false picture of activities in
particular stocks. The court noted that Ageloff defined fictitious
trades as trades where "no money changed hands" whereas the
transactions in the government's reports were "settled trades" in
which money was actually conveyed to the seller by the purchaser.
Id. at 102. Nevertheless, exercising its statutory discretion to
fashion an appropriate restitution order, the court "in an
abundance of caution" adopted a requirement that each victim
seeking to obtain restitution certify under penalty of perjury that
he or she sustained the losses identified in the report and that
such losses have not been "offset by recovery from another source,
such as arbitration, civil action, or a sale." Id. at 103.
Further, if after 20 years, restitution funds collected from

27

Ageloff remain undistributed, they will be returned to him. Id. at 104.

The court rejected Ageloff's remaining objections to the restitution report as "either a rehashing of arguments that I have previously found to be meritless and that are beyond the scope of the limited mandate, or frivolous on their face." Id. at 104.

With respect to Ageloff's request for CJA funds, the court stated that, while it "continue[d] to harbor serious misgivings about the public financing of Ageloff's defense," it would allow current counsel "reasonable CJA compensation for appropriate services performed to date" in view of the "practicalities in play." Id. at 106. It denied as moot Ageloff's requests for additional funds "without reaching the question of Ageloff's financial eligibility." Id. The court also denied Ageloff's request for return of the more than $500,000 that Ageloff had previously paid to the Clerk of the Court toward the satisfaction of his restitution obligation. Id.

The court rejected Ageloff's motion to dismiss the restitution proceedings or to impose no restitution at all as the result of delay in the proceedings following remand. Id. at 107. The court acknowledged that the delay had been "most regrettable" and noted:

> Ageloff's distant incarceration and eventual
> prosecution in Florida for secreting funds
> away from the victims of his fraud, the
> several changes in attorneys on both sides of

> the case, lengthy adjournments in anticipation
> of agreement between the parties, and this
> Court's regrettable failure to press for
> closure, have dragged the proceedings.

Id. at 106-07.  Nevertheless, the court ruled that these circumstances did not absolve Ageloff of the obligation to pay restitution.  It noted that "the dispositive inquiry" was "whether Ageloff was prejudiced by the delay of which he complains." Id. at 107.  The court found that the answer to that question was "an unequivocal no." Id.

With regard to Ageloff's claim that the restitution order violated the requirement of 18 U.S.C. § 3664(d)(5) that a restitution order be imposed within 90 days of sentencing, the court noted that this Court had rejected that claim in Catoggio and that Ageloff's claim was no more persuasive now.  As the Court ruled in Catoggio, any error in failing to comply with the 90-day requirement was harmless because Ageloff could not show prejudice. See id. at 107-08.  The district court rejected Ageloff's claim of prejudice based on the allegation that the government had not "been forthright in 2002 and 2003 about its lack of meaningful loss data," and that Ageloff had thereby been deprived of an opportunity to secure information necessary to rebut the government's restitution claims.  Id. at 108.  It noted that the government had filed the restitution report in June of 2002 and fully responded to Ageloff's discovery requests in its July 2003 letter, thus allowing Ageloff to generate a "comprehensive set of objections." Id.

Moreover, the court noted that, as this Court said in <u>Catoggio</u>, the purpose of the statutory 90-day requirement was to protect victims, not defendants. <u>Id</u>. at 108. It would therefore be particularly inappropriate to allow Ageloff to use the delay to escape his restitution obligation when he had taken advantage of the delay "by doing just as the drafters of the 90-day provision feared, namely, by engaging in the willful dissipation of the assets that should have gone to the victims." <u>Id</u>. (emphasis deleted).

The court also rejected Ageloff's due process claims based upon <u>United States v. Ray</u>, 578 F.3d 184 (2d Cir. 2009). The court noted that this case involved substantially less delay than <u>Ray</u>, that the unimposed sentence in <u>Ray</u> was custodial rather than simply restitution, and that, in contrast to the defendant in <u>Ray</u>, Ageloff had not been leading a law-abiding life during the period of the delay, believing that the criminal case was behind him. Instead, Ageloff had "spent the last ten years in prison, has continued to engage in criminal conduct, and ha[d], through both his secreting of restitution assets and his zealous litigation of restitution-related issues, demonstrated that he did not believe that the restitution matter 'was behind him.'" <u>Id</u>. at 110 (quoting <u>United States v. Paul</u>, 634 F.3d 668, 675 (2d Cir. 2011)).

Finally, the court rejected Ageloff's motion to withdraw or vacate his guilty plea. The court found this claim barred by the mandate rule. In any event, the court found that there was no

merit to Ageloff's claim that the government had violated its Brady obligations or that the attorneys who represented him in connection with his guilty plea had provided ineffective assistance of counsel.  Id. at 111-12.

After filing a notice of appeal from the district court's decision, Ageloff moved to stay the release of any of the $536,000 previously collected in connection with Ageloff's restitution obligation.  (A 39, entry 1621).  In addition, Ageloff sought the release of $30,000 from those funds to pay for appellate counsel. The district court (Gleeson, J.)[6] denied this motion, finding that there was "virtually no chance" that Ageloff's appeal "will result in a reduction in the restitution amount to an amount less than the $536,000 now on deposit with the Clerk of the Court."  (A 39, entry 1624).

---

[6]     Judge Gleeson ruled on the motion during Judge Dearie's extended illness.

SUMMARY OF ARGUMENT

There is no merit to Ageloff's contention that the district court erred by not holding a testimonial hearing. This Court's mandate did not require such a hearing, nor was a hearing constitutionally required. The court acted within its discretion in deciding the restitution amount based upon written submissions.

Ageloff's right to a speedy sentencing was not violated. Ageloff was partially responsible for the delay on remand. In any event, he fails to make the required showing of prejudice to be entitled to any relief.

The district court properly denied Ageloff's motion for the return of funds he had previously paid to the Clerk of the Court in connection with his restitution obligation. The court had the authority under the All Writs Act to hold the funds and, in the circumstances of this case, acted within its discretion in doing so.

The district court did not abuse its discretion in denying Ageloff's motion for CJA funds for a forensic accountant and private investigator. Ageloff failed to carry his burden of showing that such services were reasonably necessary to his defense.

Finally, Ageloff has shown no basis for reassignment of the case to a different judge in the event of a remand.

ARGUMENT

POINT ONE

THE DISTRICT COURT WAS NOT REQUIRED TO
HOLD A TESTIMONIAL HEARING ON RESTITUTION

Ageloff first claims that the district court improperly resolved the restitution issue without conducting a testimonial hearing. Specifically, he contends that the failure to hold such a hearing violated the mandate rule and his Fifth and Sixth Amendment rights. (Br. 34-41). These claims have no merit.

To begin with, this Court's opinion in Catoggio did not require the district court to conduct a full-fledged testimonial hearing. Rather, the Court noted that "proceedings to determine the victims and their actual losses are currently under way in the district court." Catoggio, 326 F.3d at 330. It then directed the district court to "incorporate the findings from those proceedings into a new restitution order" and to "schedule a sentencing hearing on restitution forthwith." Id. The "proceedings" to which the Court referred consisted of the government's filing of the restitution report and Ageloff's filing of objections to the report. Following the remand, the government filed its responses to Ageloff's objections. The Catoggio Court's direction to "incorporate the findings from those proceedings into a new restitution order" could thus be satisfied simply ruling on Ageloff's objections.

Nor did the Catoggio opinion's reference to "a sentencing

hearing" necessarily mean a testimonial hearing. This Court has recognized that the term "hearing" encompasses a range of proceedings. For example, in appropriate cases, a district court has discretion to satisfy the statutory requirement of conducting a "hearing" on a petition under 28 U.S.C. § 2255 by deciding the case on the basis of written submissions, without taking any live testimony of witnesses. See, e.g., Chang v. United States, 250 F.3d 79, 85-86 (2d Cir. 2001) (district court properly resolved factual dispute by relying upon affidavit submitted by defendant's former attorney).

In the context of sentencing, factual disputes also need not always be resolved by a testimonial hearing. See United States v. Slevin, 106 F.3d 1086, 1091 (2d Cir. 1996) ("The district court is not required by either the Due Process Clause or the federal Sentencing Guidelines to hold a full-blown evidentiary hearing in resolving sentencing disputes."). Indeed, the district court has broad discretion to determine the procedures it will follow in resolving disputed sentencing factors. See United States v. Prescott, 920 F.2d 139, 143-44 (2d Cir. 1990); see also United States v. Sabhnani, 599 F.3d 215, 257-58 (2d Cir. 2010) ("We have noted, in the context of contested issues regarding the propriety of a restitution award, that the sentencing procedures employed to resolve such disputes are within the district court's discretion so long as the defendant is given an adequate opportunity to present

34

his position"). Among other things, a court may rely upon general knowledge it has gained from presiding over the case, including the trials of related defendants. See United States v. Tracy, 12 F.3d 1186, 1203 (2d Cir. 1993); United States v. Carmona, 873 F.2d 569, 574 (2d Cir. 1989).

To be sure, a "sentencing hearing" would ordinarily involve a defendant's presence for the imposition of the sentence. However, Ageloff expressly waived that right when he asked the district court to satisfy the writ of habeas corpus ad prosequendum and have him returned to Florida. (GA 84). Remarkably, Ageloff ignores his own waiver while complaining that "the district court ultimately sentenced Ageloff outside of his and his counsel's presence and did so without warning or notice." (Br. 35). In light of Ageloff's waiver, this Court's direction to conduct a sentencing hearing did not preclude the district court from resolving the disputed issues based upon written submissions.

Ageloff's constitutional argument fares no better. While Ageloff relies upon the general due process balancing test outlined in Mathews v. Eldridge, 424 U.S. 319, 335 (1976), he ignores a long line of precedent from this Court holding that due process does not require that disputed sentencing issues, including the amount of restitution, be resolved by a testimonial hearing. See, e.g., Sabhnani, 599 F.3d at 257-58; United States v. Maurer, 226 F.3d 150, 151 (2d Cir. 2000); Slevin, 106 F.3d at 1091; United States v.

Eisen, 974 F.2d 246, 269 (2d Cir. 1992).  Rather, "[a]ll that is required is that the court afford the defendant some opportunity to rebut the Government's allegations."  Slevin, 106 F.3d at 1091 (citation and internal quotation marks omitted).  Ageloff was plainly given that opportunity here.  He filed extensive objections to the government's restitution report over a period of years both while acting pro se and through counsel.  (See A 109-12, 197-201, 237-66, 267-68).  He therefore received all of the process to which he was constitutionally entitled.

The question then becomes simply whether the district court abused its discretion in not holding a testimonial hearing. Plainly, it did not.  As the court explained in its opinion:

> [A]n evidentiary hearing was not necessary. Ageloff was furnished with both the report and the blue sheet data upon which it was based and those materials proved sufficient for him to identify and brief his objections, and the parties' copious submissions, in turn, furnish an adequate basis for me to rule upon those objections and fashion a restitution order appropriately responsive to the Circuit's mandate.

Ageloff, 809 F. Supp. 2d at 98 n.7.

The district court reasonably concluded that conducting a testimonial hearing would add little to its ability to make reliable findings on the disputed issues.  The government's restitution report was prepared by the NASD using electronic "blue sheet" records that reflected the actual purchases and sales of the House Stocks promoted by Ageloff and his co-conspirators.  (A 85).

As the district court noted, the electronic blue sheet reporting system was established by SEC regulation and is routinely relied upon as an enforcement tool. See id. at 98 n.6; see also United States v. Gushlak, 2011 WL 782295, *5 (E.D.N.Y. Feb. 24, 2011) (holding that "blue sheet" trading records were "far more likely to reliably state a victim's actual losses" from stock fraud than victim-loss affidavits). Beyond his inaccurate description of the NASD as a "victims' advocacy group" (Br. 36)[7] and his conclusory and baseless assertion that the report was "derived from guesswork and supposition" (Br. 17), Ageloff offers no serious argument that the trading records were unreliable.[8]

Moreover, some of Ageloff's objections to the restitution report, such as his claim that Hanover Sterling's House Stocks retained some residual value after the firm closed, had previously been raised at Ageloff's original sentencing in 2001. For example, in 2001, Ageloff submitted a report by David I. Tabak -- the same expert that Ageloff wanted to retain in 2010 for the restitution hearing. (A 161, 168). See id. at 100 n.9. The district court

---

[7] The NASD, now known as FINRA, is in fact an independent regulator of securities firms. See www.finra.org/AboutFINRA/.

[8] Ageloff correctly notes that the government described the restitution report as "incomplete" (Br. 36), but that was because, as the district court noted, it understated the victims' actual losses by millions of dollars by omitting some stocks, clearing houses and reporting periods. See Ageloff, 809 F. Supp. 2d at 98. Any incompleteness in the report therefore did not prejudice Ageloff.

considered Tabak's 2001 report concerning the valuation of the House Stocks after Hanover Sterling's demise. <u>See id</u>. at 101 n.12. The court also considered the findings of the bankruptcy judge in <u>In re Adler Coleman Clearing Corp.</u>, 247 B.R. 51 (Bankr. S.D.N.Y. 1999), on which Ageloff also relied, concerning this same subject. <u>See Ageloff</u>, 809 F. Supp. 2d at 101. The court thus had an ample factual basis to evaluate Ageloff's claim.

Finally, Ageloff's complaint that he was unfairly misled by the court's originally-stated intention to conduct an evidentiary hearing (Br. 40-41) is without merit as well. As Ageloff notes, the court scheduled an evidentiary hearing for May 17, 2010, at which the government intended to present the "brief testimony" of the NASD employee who prepared the restitution report. (A 274). On May 4, 2010, defense counsel submitted an application for an interim CJA voucher in which he estimated that the hearing would last "at a minimum, three months, if we work five days a week" and would involve the admission of "at least 31,000 documents" in Ageloff's defense. (A 269). On May 6, 2010, the government provided the court with transcripts from Ageloff's Florida case showing that, contrary to Ageloff's prior denial (A 160), Ageloff's money laundering offense did indeed involve the proceeds of the fraud in this case. (A 273).

As the court explained at a status conference on May 11, 2010, the information showing the connection between Ageloff's

38

Florida money laundering activities and the fraud in this case caused the court to reconsider the question Ageloff's entitlement to CJA funds. (A 284-85). The hearing on Ageloff's entitlement to CJA funds took place on June 1, 2010. On July 7, 2010, Ageloff announced that he "waive[d] the right to be physically present for future sentencing proceedings" and asked to be returned to Florida. (GA 84).

In its opinion, the district court concluded that Ageloff's objections to the restitution report were part of an effort to "manufactur[e] complexity" and thereby convince the court to abandon its effort to calculate restitution as unreasonably burdensome and complex. See Ageloff, 809 F. Supp. 2d at 98-99. Nothing more graphically illustrated the basis for the court's concern than Ageloff's estimate of the length and scope of the proposed restitution hearing. Further, this hearing was to be conducted with a defense attorney, potentially a second defense attorney (A 270), a forensic accountant and/or expert witness (A 140, 161), a private investigator (A 183), and the expense of subpoenaing massive numbers of documents (A 270), paid for by CJA funds to which Ageloff's entitlement was questionable. Further, Ageloff himself declined to be present for this hearing, leaving the burden of conducting of the proceedings to his publically-funded defense team, the government and the court. And finally, this enormous undertaking and expense would follow Ageloff's

admitted laundering of millions of dollars from the proceeds of his fraud for the specific purpose of defeating the right of victims to receive the restitution that was the intended focus of the hearing.

In light of these circumstances, and the fact that all of Ageloff's objections could be resolved based upon the existing record, it is obvious why the district court reconsidered its decision to hold a hearing. That decision was a sound exercise of the court's discretion and did not unfairly prejudice any of Ageloff's legitimate rights.

POINT TWO

AGELOFF'S RIGHT TO A SPEEDY
SENTENCING WAS NOT VIOLATED

Ageloff next contends that the delay between the issuance
of this Court's mandate and the district court's restitution order
violated his rights under the Due Process Clause, the Sixth
Amendment, Fed. R. Crim. P. 32(b)(1), and 18 U.S.C. § 3664(d)(5).
The district court properly rejected this claim.

As the district court noted, the delay on remand was
"most regrettable." Ageloff, 809 F. Supp. 2d at 106. The court
correctly observed that the government bore responsibility for some
of the delay by failing to be "more responsive to the efforts of
Ageloff's prior counsel, Brian Bieber, to address the restitution
question during 2004," Ageloff, 809 F. Supp. 2d at 107 n.17.
However, Ageloff himself was clearly at fault as well.

The proceedings were substantially delayed from the
outset because Ageloff had not retained counsel. This Court's
mandate in Catoggio issued in May 16, 2003. Less than two months
later,[9] the government responded to all of Ageloff's outstanding

_____

[9]     Ageloff faults the government for "fail[ing] to respond
to Ageloff's October 8, 2002 letter until July 11, 2003." (Br.
24). That assertion is false. The government in fact responded to
Ageloff's pro se objections on December 5, 2002 and January 15,
2003. (GA 7, 10). In the latter submission, the government
explained that district court had no jurisdiction over Ageloff's
pro se objections concerning the restitution report until this
Court decided Ageloff's appeal and issued its mandate. (GA 12).
The district court so-ordered the government's application to hold
Ageloff's submissions in abeyance until the appeal was decided.

objections and discovery requests, offered to provide Ageloff with
the electronic database on which its restitution report was based
and suggested that the court should schedule a status conference
and that Ageloff should be granted "a reasonable period to reply to
this submission." (A 84-92). However, as the government also
noted, it was impossible to resolve the outstanding restitution
issues while Ageloff remained "pro se and . . . incarcerated in
Florida." (A 86). Ageloff, who had moved for a stay of the
restitution proceedings until his certiorari petition was decided
(which motion the government opposed (A 86)), waited several
additional months after certiorari was denied before retaining
counsel, who did not enter a notice of appearance until May 17,
2004, a year and a day after the mandate issued. And the law firm
that Ageloff belatedly retained was the same one that had
represented him at the original sentencing in 2001. There is no
apparent reason that Ageloff could not have retained this firm
months earlier.

Ageloff was also solely responsible for the delay that
resulted from his 2008 money-laundering prosecution in Florida. In
contrast to delay caused by negligence or oversight, this delay
resulted from Ageloff's criminal conduct specifically intended to
defeat the purpose of the remand by thwarting the right of his
victims to recover restitution. It should thus count particularly

---

(A 27, entry 1336).

42

heavily against him. Cf. Barker v. Wingo, 407 U.S. 514, 531 (1972) (deliberate delay, engineered for tactical advantage, counts most heavily against government in speedy trial claim). It was not until the second half of 2009 that proceedings in the Florida case were concluded and Ageloff could be returned to New York. (A 94). And, by that point, Ageloff was once again acting pro se, having discharged the law firm that he had waited a year to retain following the issuance of the mandate. Ageloff then sought the appointment of CJA counsel. The court offered to appoint Ageloff's former attorney under the CJA to expedite the proceedings (A 97-98), but Ageloff rejected the offer (A 102), thereby resulting in the appointment of a new attorney who required additional time to become familiar with the case. It was not until early 2010 that new counsel was ready to proceed with his representation of Ageloff.

In any event, regardless of how responsibility for the delay should be apportioned, the dispositive question, as this Court held in Catoggio and the district court recognized, is whether Ageloff can show prejudice from the delay. The district court found that Ageloff had not shown prejudice; indeed, it characterized his claim of prejudice as "frivolous." Ageloff, 809 F. Supp. 2d at 108.

Ageloff now effectively concedes that he cannot show prejudice when he complains that he was "foreclosed" from doing so

by the lack of a testimonial hearing. (Br. 46). But Ageloff's mere speculation that some unidentified evidence may have been lost or that some unidentified "witnesses' memories [may] have faded" (Br. 46) would have been wholly insufficient to justify an evidentiary hearing. In any event, the district court ruled that no hearing was necessary to determine the proper amount of restitution because Ageloff's objections to the restitution report could be resolved on the existing record. Thus, the case did not turn upon the vagaries of witnesses' memories or allegedly missing evidence, and there would be no reason to hold a hearing concerning such matters.

Ageloff apparently attempts to avoid the requirement of showing prejudice by misstating the holding of United States v. Ray, 578 F.3d 184 (2d Cir. 2009). However, contrary to Ageloff's assertion, the Court in Ray did not merely "look[] at two factors: (1) the delay's length, and (2) the delay's reason." (Br. 42). Rather, the Court identified the two elements of a due process claim based upon sentencing delay as "[1] the reasons for the delay as well as [2] prejudice to the accused." Id. at 199 (quoting United States v. Lovasco, 431 U.S. 783, 790 (1977)) (emphasis added); see also id. at 200 ("To prove a due process violation as the result of a sentencing delay, the prejudice claimed by the defendant, absent extraordinary circumstances, must be substantial and demonstrable.").

44

The facts that led the Court in Ray to find a due process violation were extraordinary. Specifically, during a 15-year delay between the remand of her case and her resentencing, the defendant in Ray, believing that the case was over, lived openly in her community under her own name, obtained lawful employment, remarried, raised three children and enrolled in a community college. See id. at 187. When her resentencing finally occurred, the district court imposed a sentence that included a six-month term in a halfway house. In finding that the defendant had demonstrated prejudice from the delay, the court noted "the upset that a custodial sentence would now entail" to the "law-abiding and productive life" the defendant had been leading for 15 years. Id. at 202.

Ageloff's case is entirely different. For starters, the delay involved here, while obviously substantial, is only slightly more than half as long as the delay in Ray. More importantly, the prejudice calculus is entirely different. Unlike the situation in Ray, Ageloff's resentencing pertained only to restitution and did not involve the potential imposition of a custodial sentence. Further, during the delay, Ageloff had not been living in the community under the belief that his case was over; he was in prison the whole time knowing full well that he faced resentencing as to restitution. And far from rehabilitating himself during the period of delay, Ageloff engaged in laundering the proceeds of the crime

45

for which he was to be resentenced. In short, Ageloff utterly fails to make the "substantial and demonstrable" showing of prejudice that Ray requires. See Ray, 578 F.3d at 200.

Ageloff fares no better by invoking other legal theories. As he concedes (Br. 43), this Court ruled in Ray that the Sixth Amendment right to a speedy trial does not apply to sentencing. See Ray, 578 F.3d at 198-99. His reliance on Fed. R. Crim. P. 32(b)(1) and United States v. Grabina, 309 F.2d 783, 786 (2d Cir. 1962), fails because, as he recognizes, that theory requires "that the delay must partake of the purposeful and oppressive, or even smack of deliberate obstruction on the part of the Government, before relief will granted." Id. (internal quotation marks omitted). As the district court found, "the delay in this case cannot conceivably be so characterized." Ageloff, 809 F. Supp. 2d at 110. Indeed, Ageloff has never alleged that the government engaged in "purposeful delay," let alone "deliberate obstruction."

Finally, Ageloff's renewed reliance on 18 U.S.C. § 3664(d)(5) fails for the same reasons that this Court identified in Catoggio: the purpose of requiring that restitution orders be entered within 90 days of sentencing "was not to protect defendants, but rather to protect victims from the willful dissipation of a defendant's assets." Catoggio, 326 F.3d at 330. A defendant is not entitled to any relief for a violation of this provision without a showing of prejudice. See id. at 329-30.

46

Thus, Ageloff's failure to show prejudice once again dooms his claim.

POINT THREE

THE DISTRICT COURT PROPERLY DENIED
AGELOFF'S MOTION FOR RELEASE OF FUNDS

Ageloff next contends that the district court erred in denying his motion for release of approximately $536,000 on deposit with the clerk's office that consisted of payments that he had made toward his restitution obligation in 2001. Ageloff claims that he was entitled to these funds under the Fifth and Sixth Amendments so that he could pay counsel. The district court denied Ageloff's motion, noting that this Court's decision in Catoggio "did not absolve Ageloff of his restitution obligation." Ageloff, 809 F. Supp. 2d at 106. Ageloff's challenge to that ruling is without merit.

To begin with, Ageloff's description of the funds as "untainted" and his reliance on cases and principles involving the pretrial restraint of funds potentially subject to forfeiture are wholly beside the point. This issue involves Ageloff's obligation to pay restitution, not whether the funds are subject to forfeiture. The question of whether the funds were "tainted" is irrelevant to whether the defendant is obligated to use them to satisfy a restitution obligation. Further, in contrast to the cases cited by Ageloff involving the pretrial restraint of funds, see United States v. Monsanto, 924 F.2d 1186, 1203 (2d Cir. 1991) (en banc), Ageloff pled guilty to the charges in this case. Thus, there was no need for an inquiry as to whether there was probable

48

cause that he committed the crimes charged.

Ageloff's one argument directed specifically to the law of restitution, as opposed to forfeiture, is that the district court lacked "statutory []or common law authority" to retain the funds once this Court in <u>Catoggio</u> vacated the prior restitution order. (Br. 50-51). He is wrong. Under the All Writs Act, 28 U.S.C. § 1651, district courts have authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to usages and principles of law." District courts, both in and outside this Circuit, have held that the All Writs Act authorizes the restraint of the assets of a defendant who has not yet been sentenced to insure compliance with restitution obligations the court may later impose. <u>See</u> <u>United States v. Sullivan</u>, 2010 WL 5437243, *5-*6 (E.D.N.C. Nov. 17, 2010); <u>United States v. Hatfield</u>, 2010 WL 4235815, *1 (E.D.N.Y. Sept. 27, 2010); <u>United States v. Simmons</u>, 2008 WL 336824, *1 (E.D. Wis. Feb. 5, 2008); <u>United States v. Numisgroup Int'l Corp.</u>, 169 F. Supp. 2d 133, 137-39 (E.D.N.Y. 2001); <u>United States v. Ross</u>, 1993 WL 427415, *1 (S.D.N.Y. Oct. 15, 1993).

For example, in <u>Numisgroup</u>, the defendants were found guilty by a jury of mail and wire fraud in connection with a scheme to market overvalued coins to collectors. The court ruled that approximately 26,600 coins that had been seized from the defendants were not subject to forfeiture but would be restrained under the

49

All Writs Act as collateral in anticipation of an order of restitution to be entered at sentencing. The court rejected the defendants' argument that the coins should be released to allow the defendants to pay for counsel, noting that "[w]hile it is true . . . that it is important that [defendants] retain competent counsel, the rights of the victims to be compensated and made whole again . . . are of paramount importance." 169 F. Supp. 2d at 139. The court also noted that the defendants' right to counsel could also be protected under the CJA. Id.

In this case, the district court acted well within its authority and discretion in denying Ageloff's motion for release of the funds.[10] While this Court's decision in Catoggio vacated the original restitution order, the opinion clearly contemplated the entry of a new restitution order on remand. Moreover, there was no possibility that the new restitution amount would be less than the $536,000 on deposit with the clerk of the court. Indeed, the fair reading of Catoggio was that this Court contemplated that the new restitution order could well exceed the $80 million in restitution originally ordered. See Catoggio, 326 F.3d at 329 (noting that "Ageloff admitted to causing losses exceeding $80 million") (emphasis in original).

---

[10]    It is of no moment that the district court did not cite the All Writs Act in its order. The district court's decision may be affirmed on any basis that is supported by the record. See, e.g., United States v. Yousef, 327 F.3d 56, 156 (2d Cir. 2003); United States v. Hammad, 902 F.2d 1062, 1064 (2d Cir. 1990).

50

Further, without belaboring the obvious, the district court had good reason not to release funds to Ageloff after Ageloff had previously sought by criminal means to place his assets beyond the reach of victims who were entitled to restitution for his crimes. Here, as in <u>Numisgroup</u>, the rights of the victims were paramount.

Finally, Ageloff's claim that he was denied the right "to retain counsel of his choice" (Br. 48) is singularly unpersuasive. Ageloff never expressed a desire to retain any attorney other than his appointed counsel, Mr. Fenstermaker. Moreover, the district court protected Ageloff's right to counsel by authorizing the expenditure of "reasonable CJA compensation for appropriate services" to Mr. Fenstermaker despite its "serious misgivings about the public financing of Ageloff's defense." <u>Ageloff</u>, 809 F. Supp. 2d at 106. Indeed, the court had previously given Ageloff the option of using CJA funds to pay for Mr. Bieber, the attorney that Ageloff had previously retained. (A 98, 101-02). There is thus no basis to contend that Ageloff was denied the right to counsel of his choice.

POINT FOUR

THE DISTRICT COURT PROPERLY DENIED
AGELOFF'S REQUESTS FOR CJA FUNDS FOR
A FORENSIC ACCOUNTANT AND AN INVESTIGATOR

Ageloff contends that the district court abused its discretion by denying him CJA funds to hire a forensic accountant and a private investigator. This claim also lacks merit.

The CJA provides for the appointment of "investigative, expert, or other services necessary for adequate representation." 18 U.S.C. § 3006A(e)(1). In deciding whether to authorize the retention of such services, a trial court is "obligated to exercise [its] discretion in determining whether such services are necessary." United States v. Oliver, 626 F.2d 254, 259-60 (2d Cir. 1980) (footnote omitted). The court "need not authorize an expenditure under subdivision (e) for a mere 'fishing expedition.'" United States v. Durant, 545 F.2d 823, 826-27 (2d Cir. 1976) (quoting United States v. Schultz, 431 F.2d 907, 911 (8th Cir. 1970)). Rather, it should exercise its authority "when underlying facts reasonably suggest that further exploration may prove beneficial to the accused in the development of a defense to the charge." Id.

The defendant bears the burden of showing that the requested services are necessary to prepare an adequate defense. See United States v. Sanchez, 912 F.2d 18, 22 (2d Cir. 1990). This Court reviews a district court's denial of a defense request for

52

CJA funds for an abuse of discretion.  See id. at 21.  Moreover, the issue is subject to harmless error analysis.  See United States v. Smith, 987 F.2d 888, 892 (2d Cir. 1993).

Measured against these standards, Ageloff's challenge to the district court's ruling fails.  Given the limited scope of the resentencing ordered by the Court in Catoggio, Ageloff's applications failed to show, with any specificity, why expert or investigative services were necessary to his defense.  In his first application on March 23, 2010, counsel sought to justify a request for $10,000 by merely noting the volume of the records in the case and explaining that he wanted an expert to perform "a detailed analysis of these records, as well as Mr. Ageloff's October 2002 objections to the government's restitution report."  (A 140). Counsel later vaguely asserted that an expert was required to make a "detailed consideration of fact- and law-specific findings regarding the value of literally thousands of securities transactions, parallel illegal conduct by actors unaffiliated with Mr. Ageloff, and sophisticated corporate finance analysis." (A 183).  Notably, in a March 27, 2010 letter to the court, defense counsel suggested that he himself was unsure precisely what the expert would be doing, since he sought permission to have his proposed expert interview Ageloff at the MDC to "learn the scope of the project."  (A 161).

To the extent that counsel did identify the specific

53

purpose of the proposed expert and investigative services, it concerned issues that the district court had already ruled were legally irrelevant. In explaining the alleged need for a private investigator, counsel stated that "we must find and interview witnesses with knowledge of the short selling that took place from January 1995 through March of 1995." (A 187). Counsel also apparently referred to alleged short selling activity when he explained that Ageloff needed an accountant to analyze "parallel illegal conduct by actors unaffiliated with Mr. Ageloff." (A 183). But the district court had already ruled as a matter of law at Ageloff's original sentencing that the actions of short sellers did not mitigate the loss for which Ageloff was responsible. See Ageloff, 809 F. Supp. 2d at 104-05. Ageloff did not challenge that ruling in the prior appeal, and the district court was not required to revisit the issue on remand, let alone authorize the expenditure of thousands of dollars of CJA funds to investigate it.

Finally, Ageloff's eligibility for any CJA funds whatever was questionable. The district court expressed "serious misgivings" about that subject even though it allowed counsel reasonable compensation for work already performed in light of "the practicalities in play." Id. at 106. While Ageloff testified at the June 1, 2010 hearing that he lacked funds to pay for his defense, his credibility was hardly above reproach, especially given the conduct for which he was convicted in this case and in

54

the 2008 Florida case.  Indeed, even the limited facts elicited at
that hearing further undermined Ageloff's credibility.  In perhaps
the most glaring example, Ageloff testified that a person named
"Joe," whom he had known for 15 years, had helped pay the $22,000
legal fee for Ageloff's appeal in the Florida case, but Ageloff
also claimed that he could not remember "Joe's" last name.
(GA 52).  Further, as the district court noted, there was evidence
at Ageloff's original sentencing that Ageloff's financial holdings
were murky and included offshore bank accounts.  See id. at 92 n.2.
Thus, it was quite possible that Ageloff retained hidden assets.
Given these circumstances, and the fact that it was Ageloff's
burden to prove his entitlement to CJA funds, the district court
clearly did not abuse its discretion in denying his inadequately-
supported applications for additional CJA funds for a forensic
accountant and a private investigator.

55

POINT FIVE

THERE IS NO BASIS FOR REASSIGNMENT

Finally, Ageloff asks for the case to be remanded to a different judge and for appointed counsel to be relieved. While the government takes no position on whether counsel should be relieved, Ageloff's assertion that the case should be reassigned in the event of a remand is completely baseless.

"Remanding a case to a different judge is a serious request rarely made and rarely granted." United States v. Awadallah, 436 F.3d 125, 135 (2d Cir. 2006). Absent proof of personal bias requiring recusal under 28 U.S.C. § 144, which Ageloff does not allege, this Court considers three factors when requested to remand a case to a new judge. The first factor is whether the original judge will have "substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected;" the second is "whether reassignment is advisable to preserve the appearance of justice;" and the third is whether reassignment will lead to "waste and duplication out of proportion to any gain in preserving the appearance of fairness." United States v. Robin, 553 F.2d 8, 10 (2d Cir. 1977) (en banc); see also United States v. Trzaska, 859 F.2d 1118, 1121-22 (2d Cir. 1988); United States v. Bradley, 812 F.2d 774, 782 n.9 (2d Cir. 1987).

Ageloff's principal allegation is that the district court

56

improperly sought to remove CJA counsel from the case and used "information well-known to it prior to CJA counsel's December 2, 2009 appointment" as a pretext for doing so. (Br. 54). This accusation is wholly unsupported by the record. As the court explained at the May 11, 2010 status conference (A 284-85), it raised the question of Ageloff's entitlement to CJA funds after recently seeing transcripts from Ageloff's Florida case -- which the government had provided only days earlier in its May 6, 2010 letter (A 273) -- showing that Ageloff's Florida money laundering offense had involved the proceeds of the fraud in this case. Part of the reason the court may not have fully appreciated the connection between the two cases previously was that Ageloff had specifically and falsely denied such a connection: in a letter to the court dated March 27, 2010, Ageloff asserted that the government's "claim that Mr. Ageloff's Florida conviction resulted from his attempt to hide the proceeds of his New York criminal activity" was "incorrect" and that these "attempts to 'dirty up' Mr. Ageloff" should be "disregard[ed]" by the court. (A 160). It thus particularly ill behooves Ageloff to attack the district court's good faith by suggesting that the court knew all along about the connection between the two cases.

Judge Dearie also stated at the May 11 conference that he had recently realized that Ageloff had apparently never filed a financial affidavit. (A 286). And notably, Ageloff never

contended that he had filed a financial affidavit, even when the court raised the question a second time at the June 1 hearing and the government noted that it too had never seen a financial affidavit from Ageloff. (GA 31-32). Further, Ageloff's pro se motions seeking the appointment of counsel did not allege that he could not afford to pay for counsel. (GA 22-25, 26-27).

In these circumstances, it was no evidence of improper bias for the district court to question Ageloff's entitlement to CJA funds. As the court noted, it was the "trustee of the public fisc." Ageloff, 809 F. Supp. 2d at 106. CJA funds are not automatically bestowed upon any defendant who asks for them but are available only upon a showing of financial need. See United States v. O'Neil, 118 F.3d 65, 74 (2d Cir. 1997). In this case, prior to the May 11 status conference, Ageloff had done nothing to satisfy his burden of showing his eligibility for CJA funds. And Ageloff's recent history hardly inspired confidence that he would not seek access to funds to which he was not entitled. It would have been reckless for the court simply to have assumed that Ageloff qualified for appointed counsel.

The other circumstances that Ageloff cites in support his reassignment claim barely merit a response. The court's reaction at the March 23, 2010 status conference that Ageloff's anticipated motion to dismiss was "outrageous" (A 150) was entirely understandable and justified given that the case had just been

delayed for the better part of two years as the result of Ageloff's prosecution and conviction for laundering the proceeds of his crime specifically to avoid paying restitution.  Ageloff's complaint that the court "never addressed" his October 2007 motion to dismiss (Br. 55) ignores the fact that the court rejected the claim raised by that motion, based upon an alleged violation of Ageloff's right to a speedy sentencing, in its opinion.  <u>See</u> <u>Ageloff</u>, 809 F. Supp. 2d at 106-10.  The court's decision that a testimonial hearing was unnecessary was proper for the reasons explained in Point One and in any event provides no evidence of bias.  And finally, Ageloff's complaint that the court sentenced him "without his or his counsel's presence" (Br. 55) once again inexplicably ignores his own waiver of the right to be present for sentencing and his expressed preference to be returned to Florida.  (GA 84-86).

59

<u>CONCLUSION</u>

For the reasons stated, the judgment of the district

court should be affirmed.

Dated:  Brooklyn, New York
        April 19, 2012



                              Respectfully submitted,

                              LORETTA E. LYNCH,
                              <u>United States Attorney</u>,
                              <u>Eastern District of New York</u>.


                   By:     _____/s/_____

                              David C. James
                              Assistant U.S. Attorney


DAVID C. JAMES,
DANIEL A. SPECTOR,
<u>Assistant United States Attorneys</u>,
     (<u>Of counsel</u>).

Certificate Concerning Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 12,985 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a monospaced typeface using Word Perfect X4 in 12 point Courier New font.

Dated:  Brooklyn, New York
        April 19, 2012

_____/s/_____
                    David C. James
                    Assistant U.S. Attorney

<u>A P P E N D I X</u>

TABLE OF CONTENTS

Page

Excerpts of Transcript of Sentencing,
   8/15/01.. . . . . . . . . . . . . . . . . . . . . . GA 1

Government's Letter to Judge Dearie,
   re: Ageloff's pro se submissions, 12/5/02.. . . . . . . . GA 7

Government's Letter to Judge Dearie,
   re: Ageloff's pro se submissions, 1/15/03.. . . . . . . . GA 10

Transcript of Status Conference, 9/7/07.. . . . . . . . . . GA 13

Motion of Brian Bieber, Esq., to Withdraw,
   3/24/09.. . . . . . . . . . . . . . . . . . . . . . GA 20

Ageloff's Pro Se Motion for Appointment of Counsel,
   6/25/09.. . . . . . . . . . . . . . . . . . . . . . GA 22

Ageloff's Pro Se Motion for Appointment of Counsel,
   8/13/09.. . . . . . . . . . . . . . . . . . . . . . GA 26

Transcript of Hearing re: Ageloff's CJA Eligibility,
   6/1/10. . . . . . . . . . . . . . . . . . . . . . . GA 29

Letter from Scott Fenstermaker, Esq. to Judge Dearie
   re: Ageloff's Request to be Returned to Florida,
   7/7/10. . . . . . . . . . . . . . . . . . . . . . . GA 84

1

```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF NEW YORK

 3    - - - - - - - - - - - - - - X

 4    UNITED STATES OF AMERICA,      :   98-CR-01129-8
                                              (RJD)
 5                       Plaintiff, :

 6       - against -                 :   United States Courthouse
                                         Brooklyn, New York
 7    ROY AGELOFF,                   :
                                         August 15, 2001
 8                       Defendant. :
      - - - - - - - - - - - - - - X

 9
                      TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
10                    BEFORE THE HONORABLE RAYMOND J. DEARIE
                      UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

13    For the Plaintiff:          LORETTA E. LYNCH
                                   United States Attorney
14                                One Pierrepont Plaza
                                   Brooklyn, New York 11201
15                                BY:  ANDREW WEISSMANN
                                        PAUL SHOEMAN
16                                Assistant United States Attorneys

17    For the Defendant:           JOEL HIRSCHHORN, ESQ.
                                   HIRSCHHORN & BIEBER, P.A.
18                                 2600 Douglas Road
                                   Coral Gables, Florida  33134

19

20

21

22

23

24

25
```

Courthouse Transcri                    :.  (914) 337-5535

98

1   my sentencing file.

2           MR. WEISSMANN:  Yes, Judge.

3           THE COURT:  Okay.

4           First let me speak briefly to the subject of

5   today's testimony.  I hate to seize on the word that the

6   government seized on, but I take it, it is not an unfair

7   characterization, the notion of compartmentalizing one's

8   life.

9           Mr. Ageloff is not the first fellow who has appeared

10  before me at sentence for sentencing who has, in other aspects

11  of his life, been responsible, indeed caring, generous, and

12  there is no doubt in my mind that Ms. Lifton and Mrs. Huff and

13  Mr. DiPaolo believe by and large that he is a... and all of

14  that.  I am sure without any doubt that his feelings for his

15  daughters, and, certainly, their feelings for him, because I

16  have read their letters, poetry, are what they are represented

17  to be.

18          I was at one time quite concerned with the arrears

19  relative to the child support, but that now has not only been

20  taken care of but apparently arrangements are made so that it

21  will not be a lingering issue or problem.

22          I am, I'm not going to say as familiar, but I am

23  very, very familiar with the line of cases in the second and I

24  think most circuits relative to the issues of extraordinary

25  family circumstances, the limited avenue of departure under

99

1  the so-called charitable works, which everybody acknowledges

2  is not ordinarily an avenue of departure, and the sort of

3  ethereal notion of a combination.  People should know,

4  certainly counsel knows, that the circumstances presented

5  here, despite the utter tragedy for the family and

6  particularly for the girls, does not come close to justifying

7  a downward departure.

8       I must say, as I think I had said earlier, in this

9  case, if I thought it did, it would be a real difficult

10  question to resolve, even at the one level urged by counsel,

11  given the activities here.

12       I am going to be somewhat benign in my

13  characterizations of what went on here for reasons which I

14  think are obvious, given the folks in attendance, some of them

15  at least.  I believe these people are in earnest and they

16  provide evidence of another side of Mr. Ageloff which is

17  commendable, a different compartment in his life, if you will,

18  but I cannot downwardly depart either in isolation or in

19  combination.

20       I hesitate, however, to single out -- bear with me

21  for just a second -- I mean, as your daughter said, this is

22  just so sad because so many people have to suffer, your own

23  family included, as a result of what went on here.

24       It is the most difficult thing I do.  To look you eye

25  to eye, man to man, is one thing.  But to look over your

Courthouse Transc          Inc.  (914) 337-5535

100

1   shoulder and see your parents and see your brother and see

2   your daughters, and all these folks who have assembled here in

3   support of you -- they are not here because you lassoed them

4   in here.  They are here, obviously, because they think well of

5   you and of your potential.  I just shake my head in

6   frustration because I don't know what else to say.

7          Your daughter wrote this poem, this extraordinary

8   poem.  "Never Enough, Ashley."

9          And in that, there is a stanza that reads:

10         "Are there really any words for this?  I find this

11  question tough.  Anything I want to say just doesn't seem

12  enough."

13         Because on the other side of the courtroom, so to

14  speak, there is a whole array of people -- decent, innocent

15  people who don't know you -- whose lives you've really upset,

16  and some of these positive characteristics that you bring to

17  your family life and to your friends are reflected in the

18  leadership qualities in a way that you brought to this

19  business and to your ability to influence these people.

20         I think I have to say to you, you know, this sentence

21  sort of brings to mind all of the young folks -- and, granted

22  they got on the bandwagon too and they saw the easy money, but

23  I saw so many young men, many without barely a high school

24  education, who got on that sort of gravy train, full of

25  excitement, full of fast money, whose careers, certainly in

101

1   the securities field, are ruined, that you had a hand in

2   leading astray.

3        I think you have to understand that there are some

4   real victims here, not only the people that lost the money --

5   they line up by the scores -- but you've got to take some

6   responsibility, in my view of it, at least, for some of those

7   younger people who were here.

8        All of them, all of them, yourself included, with due

9   respect, have been treated very fairly. We could be standing

10  in a very different situation right now. Very different

11  situation, indeed. I think all things considered, you made an

12  agreement. You negotiated hard. You made a very favorable

13  agreement. The government gave a lot of ground, and you stand

14  in as favorable light as I could conceive of under these

15  circumstances.

16       I wish I could, for your family's sake at least, I

17  wish I could provide you with greater latitude.

18       I sentence you to 96 months' imprisonment;

19       Three years' supervised release;

20       $100 special assessment;

21       Restitution in the amount of $80 million jointly and

22  severally liable with Robert Catoggio.

23       Special conditions of your supervised release: That

24  you are to make full financial disclosure as and when required

25  by and to the court.

1      30 days from today, $500,000 are to be paid in

2  satisfaction of the restitution.

3      30 days following your release, $500,000 are to be

4  paid in satisfaction of your restitution thereafter;

5      At a rate to be adjusted from time to time following

6  full financial disclosure, the sum of $10,000 per month toward

7  the restitution obligation.

8      There is a $100 special assessment.

9      MR. WEISSMANN:  Your Honor, there are two matters

10  about restitution.

11      First, is it, just so the record is clear, I take it

12  that is without prejudice to the government's ability to

13  collect on the judgment?

14      THE COURT:  Of course.

15      MR. WEISSMANN:  Second, I had spoken with defense

16  counsel prior to today about notice to the victims, that there

17  was consent by the defense that we can provide notice to the

18  court and, obviously, to all the defendants, of the names of

19  victims beyond the 90 days in the statute.

20      THE COURT:  Is that agreeable to defense counsel?

21      MR. HIRSCHHORN:  We agreed to that previously, Judge.

22      THE COURT:  Thank you.

23      MR. HIRSCHHORN:  Your Honor, by way of clarification,

24  within 30 days from today's date, a half a million dollars?

25      THE COURT:  Yes, sir.



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*One Pierrepont Plaza*
*Brooklyn, New York 11201*

*Mailing Address:* *147 Pierrepont Street*
*Brooklyn, New York 11201*

December 5, 2002

By Hand
The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

*FILED*
*IN CLERK'S OFFICE*
*U S DISTRICT COURT E D N Y*
*DEC 05 2002*
*BROOKLYN OFFICE*

          Re:  United States v. Roy Ageloff
               Criminal Docket No. 98-1129S (RJD)

Dear Judge Dearie:

          The government respectfully submits this letter to
address several pro se submissions of the defendant Roy Ageloff
in the above-captioned case.

          The defendant is currently serving a 96-month sentence
imposed by a judgment dated August 24, 2002, convicting him upon
a plea of guilty, of one count of racketeering in violation of 18
U.S.C. § 1962(c).  As part of his sentence, the Court ordered the
defendant to pay $80 million in restitution, jointly and
severally with co-defendant Robert Catoggio.  With the
defendant's consent, the Court's restitution order, which was
appended to the judgment, permitted the government to file a
report containing the names and loss amounts of the victims at a
future date beyond the 90 days otherwise required by 18 U.S.C.
§ 3664(d)(5).

          The government compiled and filed a report of the
victims' identities and losses in June 2002.  The report, which
is 1,718 pages long, identified more than 9,000 victims who,
based on available data, suffered a net loss.  The fraud losses
identified in the report total $192,119,571.65.  As of the filing
of the report, only $1.3 million, including $500,000 from
Ageloff, had been collected.

          All defense counsel were alerted to the filing and
offered the opportunity to obtain a copy.  At the government's
request, the Court allotted sixty days for defendants to lodge

13-31

2

objections.  Thereafter, Ageloff, pro se, requested a copy of the
report, which the government provided.  Ageloff was also
permitted additional time to respond.  In October 2002, the
government received the defendant's pro se objections to the
report.  Ageloff is the only defendant to file objections to the
restitution report.

The defendant, represented by appellate counsel, is
also pursing an appeal of the Court's restitution order to the
Second Circuit.  The appeal was fully briefed in early 2002 and
will be argued on January 7, 2003.  The issues raised in the
appeal overlap with those in Ageloff's objections to this Court.

Recently, Ageloff filed a series of additional pro se
submissions in this Court relating to the restitution order and
other matters.  One such application, dated November 6, 2002,
seeks an order of the Court permitting Ageloff to make legal
calls from prison for the purpose of obtaining counsel to
represent him in this Court with respect to his pending
applications.[1]

In an effort to address Ageloff's pro se applications,
the government has contacted Ageloff's appellate counsel and a
civil attorney who currently represents Ageloff on other matters.
Both attorneys have indicated that they do not represent Ageloff
in the proceedings currently before the Court.  Nonetheless,
given that he has retained counsel for other purposes and appears
intent on retaining counsel to appear before the Court, the
government is hopeful that counsel will soon appear for Ageloff
with respect to his pending applications.

The government is, of course, obliged to respond to the
defendant's submissions even if he does not retain counsel.
Nonetheless, to permit the defendant adequate time to retain
counsel, which may facilitate the resolution of the defendant's
claims, the government respectfully requests that it be permitted
to submit its response to all pending applications on or before
January 15, 2002, which is shortly after the defendant's appeal
will be argued.

The defendant will not be prejudiced by the timing of
the government's response because, given the defendant's appeal

---

[1]The government is hopeful that Ageloff will succeed in
obtaining legal counsel, but this it appears that neither this
office nor the Court has authority to intercede in the internal
security procedures of the prison.

3

and objections in this Court, no restitution funds have been distributed.

                              Respectfully submitted,

                              ROSLYNN R. MAUSKOPF
                              UNITED STATES ATTORNEY

                    By:       _____
                              Paul Schoeman
                              Assistant U.S. Attorney

cc:  Roy Ageloff
     Inmate #57431-053
     P.O. Box 1031
     Coleman, FL  33521-1031
     Clerk of the Court (RJD)



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

_____

*One Pierrepont Plaza*
*Brooklyn, New York 11201*

*Mailing Address:*  *147 Pierrepont Street*
*Brooklyn, New York 11201*

January 15, 2003

<u>By Hand</u>
The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

           Re:  United States v. Roy Ageloff
                <u>Criminal Docket No. 98-1129S (RJD)</u>

Dear Judge Dearie:

          The government respectfully submits this letter to
address the <u>pro</u> <u>se</u> submissions of the defendant Roy Ageloff in
the above-captioned case.  By previous letter dated December 5,
2002, the government stated that it would address the defendant's
motions in this Court after the oral argument on the defendant's
appeal to the Second Circuit was heard.

          The defendant's appeal was argued as scheduled on
January 7, 2002.  In part as a result of the argument, the
government now recognizes that with respect to matters that are
the subject of the defendant's appeal, the defendant's filing of
a notice of appeal has divested this Court of jurisdiction until
the Court of Appeals' mandate issues.  As the Second Circuit
stated in <u>United States v. Rodgers</u>, 101 F.3d 247, 251 (2d Cir.
1996), an appeal "confers jurisdiction on the court of appeals
and divests the district court of its control over those aspects
of the case involved in the appeal.  A district court does not
regain jurisdiction until the issuance of the mandate by the
clerk of the court of appeals" (citations and internal quotation
marks omitted).  Accordingly, Ageloff's challenges in this Court
to the restitution order, which is the subject of his appeal,
must await the mandate of the Second Circuit.

          Based on the foregoing, this Court lacks jurisdiction
over the following <u>pro</u> <u>se</u> filings:

2

(1) Defendant Roy Ageloff's Objections to United
States' Report of Victim Information for Purposes of
Court-Ordered Restitution, dated October 1, 2002;

(2) Defendant Roy Ageloff's Motion To Strike Plaintiff
United States' Report of Victim Information for
Purposes of Court-Ordered Restitution and Memorandum of
Law in Support Thereof, dated October 9, 2002;

(3) Letter to Honorable Raymond J. Dearie, dated
October 30, 2002;

(4) Letter to Honorable Raymond J. Dearie, dated
November 19, 2002.

The government respectfully requests that these motions and
letters be docketed and held in abeyance while the appeal is
pending.[1]

In addition to the submissions objecting to the
government's victim restitution report, Ageloff has filed a
motion dated November 6, 2002, seeking an order from this Court
directing prison officials at FCC-Coleman in Coleman, Florida,
where the defendant is incarcerated, to permit him to make
certain unmonitored legal calls. The defendant again addressed
this issue in a letter to the Court dated December 10, 2002. The
government is hopeful that Ageloff has resolved his dispute with
prison officials. I have spoken to Ageloff's civil counsel, who
does not represent him in this Court, and offered to help resolve
the issue if it remains outstanding.

In any event, this Court lacks jurisdiction to consider
Ageloff's objections and complaints as they relate to the actions
of officials at FCC Coleman. Such claims are challenges to the
execution and not the legality of his sentence and must,
therefore, be brought pursuant to 28 U.S.C. § 2241(a). See
Chambers v. United States, 106 F.3d 472, 474-75 (2d Cir. 1997)
("A challenge to the execution of a sentence, however, is
properly filed pursuant to Section 2241"). Section 2241 gives
district courts the power to grant writs of habeas corpus "within
their respective jurisdictions." 28 U.S.C. § 2241(a). This
jurisdictional grant has been interpreted to be coextensive with

---

[1]     Ageloff has filed a motion and letter to the Clerk of
the Court, both dated November 22, 2002, and a subsequent letter
dated December 6, 2002, addressing the Clerk's purported refusal
to docket his prior submissions.

3

personal jurisdiction over petitioner's custodian. See Braden v. 30th Judicial Circuit of Kentucky, 410 U.S. 484, 499-500 (1973); United States ex rel. Sero v. Preiser, 506 F.2d 1115, 1127-28 (2d Cir. 1974); Wang v. Reno, 862 F. Supp. 801, 812 (E.D.N.Y. 1994) ("[T]he jurisdiction requirement of § 2241 is read to refer to personal jurisdiction over the custodian, rather than the geographical boundaries of the district court's jurisdiction."). Accordingly, "a petition for a writ of habeas corpus under 28 U.S.C. § 2241 should be addressed to the district court in the district where the petitioner is confined and his custodian is located." United States v. Maldonado, 138 F. Supp. 2d 328, 332 (E.D.N.Y. 2001). Here, the appropriate district is the district of Florida that has personal jurisdiction over the warden of FCC Coleman.[2]

For the foregoing reasons, this Court has no jurisdiction to consider Ageloff's pro se motions at this time. His challenges to the Court's restitution order should be docketed and held in abeyance pending the issuance of the Court of Appeals' mandate for his appeal. Ageloff's November 6, 2002 motion seeking unmonitored prison calls should be dismissed.

Respectfully submitted,

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY

By: _____
Paul Schoeman
Assistant U.S. Attorney

cc: Roy Ageloff
        Inmate #57431-053
        P.O. Box 1031
        Coleman, FL 33521-1031
    Clerk of the Court (RJD)

---

[2]    A prior motion dated October 9, 2002, sought an order of this Court directing the Clerk of the Court to serve a copy of the defendant's judgment and conviction on officials at Coleman for the purpose of satisfying them that Ageloff has, thus far, complied with the Court's restitution payment schedule. By letter to the Court dated December 6, 2002, Ageloff indicated that the matter had been resolved and withdrew his motion.

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,     :     98-CR-1129 (RJD)

   -against-          :     U.S. Courthouse
                                    Brooklyn, New York
ROBERT CATOGGIO
and ROY AGELOFF,             :

      Defendants.     :     TRANSCRIPT OF PROCEEDINGS
                                    September 7, 2007
- - - - - - - - - - - - - - X     2:30 p.m.


BEFORE:
     HONORABLE RAYMOND J. DEARIE, CHIEF JUDGE



APPEARANCES:

For the Government:     ROSLYNN R. MAUSKOPF
                        United States Attorney
                        One Pierrepont Plaza
                        Brooklyn, New York  11201

                        By:  SUZANNE McDERMOTT
                             Assistant U.S. Attorney


For the Defendant:      STEVEN YUROWITZ, ESQ.

                        BRIAN BIEBER, ESQ.
                        (BY PHONE)



Court Reporter:         Holly Driscoll, CSR
                        Official Court Reporter
                        225 Cadman Plaza East
                        Brooklyn, New York  11201
                        (718) 613-2274



Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

2

1          THE COURT:  Hello.

2          MR. BIEBER:  Hello.

3          THE COURT:  Who am I talking to?

4          MR. BIEBER:  This is Brian Bieber.

5          THE COURT:  Mr. Bieber, how are you?

6          MR. BIEBER:  I'm fine.  How are you, Judge Dearie?

7          THE COURT:  I'm well.

8          MR. BIEBER:  Thank you for permitting me to appear

9    by telephone.

10          THE COURT:  I am happy to do so, although I can't

11   imagine why you wouldn't want to fly up to New York's

12   LaGuardia Airport.

13          MR. BIEBER:  I tell you because I grew up on

14   West 5th Street in Brooklyn so I would love to come back.

15          THE COURT:  Duty calls.

16          MR. BIEBER:  That's it, Judge.

17          Preliminarily, if I may, I filed my pro hac vice

18   motion and I don't think it has been ruled on yet.

19          THE COURT:  I haven't seen it but don't worry about

20   it, when I see it I will take care of it.

21          MR. BIEBER:  I appreciate that.

22          THE COURT:  So, I guess it's fair to say that I and

23   a few others dropped the ball on this remand but the primary

24   responsibility I accept is mine in the Ageloff case and, as I

25   understand it, the open issue is the identification of the

3

1  victims.

2           MS. MCDERMOTT:  Correct.

3           THE COURT:  And, of course, since that time we have

4  a new Assistant on the matter and with that introduction,

5  where does that bring us?

6           MR. BIEBER:  Well, if I may, Judge, at least two

7  years ago we had -- I personally on behalf of Mr. Ageloff had

8  tried to contact and actually did speak with an Assistant U.S.

9  Attorney, I believe his name was Eric Corngold and we have

10 spoken several times about the issue of identification of the

11 victims to come to or to try to come to an amount, if we can

12 come to an agreeable amount because Mr. Ageloff had filed pro

13 se objections to the amount and the identification of the

14 victims and, of course, the amount of the restitution.  Mr. --

15 I'm not criticizing him but just so the record is clear, the

16 way we had left off, I was waiting to hear back from him and

17 you raised the issue of dropping the ball on the remand,

18 Judge, I did not believe it was Mr. Ageloff's obligation to

19 push the issue even more than we already were.  I believe we

20 made a good faith effort and attempt.

21          THE COURT:  I have no quarrel with that.

22          MR. BIEBER:  I'm sorry, I didn't hear that.

23          THE COURT:  I said I have no quarrel with that.

24          MR. BIEBER:  So, in speaking with Ms. McDermott

25 after your courtroom deputy had called us, I guess it was

4

1   several weeks ago, Ms. McDermott and I have had several

2   cordial and candid conversations, maybe two, and we thought it

3   would be best now that she is on the matter for she and I to

4   get together either by telephone and/or in person which is the

5   opportunity I had given to Mr. Corngold, I'll fly up, I'll

6   meet with you, I'll bring our experts, we'll meet in your

7   office with your experts.

8           So, my suggestion is I speak with Ms. McDermott;

9   if necessary, schedule a conference with her, with her and/or

10  our experts to try to see if we can come to some sort of

11  resolution with the restitution issue, of course,

12  notwithstanding and not waiving any of our previous objections

13  to the inexcusable time bar issue and, of course, the amount

14  of restitution and the identification of the victims.

15          MS. MCDERMOTT:  That's correct, Mr. Bieber and I

16  have spoken on a number of occasions and I think both of us

17  feel it would be helpful to have some time so we can work this

18  out together, if at all possible.  Failing that, perhaps we

19  can come back and let you know where we are and if we need to,

20  at that point schedule a hearing.

21          THE COURT:  I guess Mr. Catoggio -- I don't know

22  why's he's here but it is always a pleasure to see him.

23          MR. YUROWITZ:  I was here because Your Honor's

24  courtroom deputy called me down for the appearance.  I

25  actually was going to -- I told Ms. McDermott our position

5

1  would be that as far as we're concerned, this matter was

2  settled and I don't think the Court has any juridiction to

3  really change the restitution order.

4          THE COURT:  And I doubt the government disagrees

5  with that.

6          MS. MCDERMOTT:  We do not.

7          MR. BIEBER:  Sorry, I missed the last part of that,

8  Judge.

9          THE COURT:  With respect to the co-defendant, the

10  matter had been resolved, the remand order did not address

11  Mr. Catoggio and, as far as I'm concerned, relative to

12  Mr. Catoggio the issue of restitution has been resolved and

13  with that --

14          MR. YUROWITZ:  Thank you, Your Honor.  Have a

15  wonderful weekend.

16          THE COURT:  You too, Happy New Year, and give my

17  best to your colleague.

18          MR. YUROWITZ:  Thank you.  I will.

19          THE COURT:  How much time, folks, within reason do

20  you need to try to caucus over this not so simple issue?

21          MS. MCDERMOTT:  How about six weeks, Mr. Bieber?

22          MR. BIEBER:  Six weeks is fine; of course,

23  notwithstanding our objections, right, Judge?

24          THE COURT:  Notwithstanding them, in other words,

25  preserving them.

6

1          MR. BIEBER:  Reserving all of our objections.

2          THE COURT:  Without prejudice to any issues now in

3   place that you've already voiced a position on.

4          MR. BIEBER:  Thank you, Judge.

5          THE COURT:  All right.  Let's give you a date.

6          THE CLERK:  October 26th.

7          MR. BIEBER:  26th of October is convenient with my

8   schedule if that works for the Court.

9          THE COURT:  Well, I'm going to be involved on trial

10  so Friday is almost necessary.  Shall we reschedule a

11  conference like this rather than bring you up?

12         MR. BIEBER:  I would appreciate you giving me the

13  opportunity like you did this time.  I'll advise by letter,

14  because if Ms. McDermott and I are butting heads, so to speak,

15  and we feel the need, you know, sometimes it is better or

16  more -- it would be -- I'm looking for the right word.

17         THE COURT:  It doesn't matter.

18         MR. BIEBER:  More beneficial to meet in person.  So,

19  if you can give me the opportunity, you know, the option, that

20  would be great, Judge.

21         THE COURT:  Okay, for that particular conference on

22  the 26th.

23         MR. BIEBER:  Correct, with my client's presence

24  being waived as well, Judge, which he did authorize me to

25  waive his presence for today's status conference.

7

1        THE COURT:  All right.  The 26th at 2:00.

2        MR. BIEBER:  Very well.

3        MS. MCDERMOTT:  Great, thank you.

4        THE COURT:  Thank you, folks.  Good luck.

5        MR. BIEBER:  Thank you, Judge.

6        MS. MCDERMOTT:  I'll speak to you next week,

7   Mr. Bieber.

8        MR. BIEBER:  Okay, Ms. McDermott.  Bye.

9        MS. MCDERMOTT:  Bye.

10        MR. BIEBER:  Bye-bye.

11        MS. MCDERMOTT:  Thank you.

12        (2:50 p.m.)

13        (End of proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25

PDF
Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
UNITED STATES OF AMERICA,

        v.

ROY AGELOFF, et al.,                  DOCKET # CR-98-1129-1& 8 (RJD)

        Defendant(s).

-------------------------------------------------X

## BRIAN H. BIEBER, ESQ'S AND HIRSCHHORN & BIEBER, P.A.'S MOTION TO WITHDRAW AS COUNSEL OF RECORD FOR DEFENDANT ROY AGELOFF

        Undersigned counsel, BRIAN H. BIEBER, ESQ. and HIRSCHHORN & BIEBER, P.A., hereby file this Unopposed Motion to Withdraw as Counsel of Record for Defendant Roy Ageloff and, as grounds therefore, states as follows:

        1.    The Defendant has advised the undersigned in writing that the Defendant no longer wishes to have the undersigned represent him in this matter.

        **WHEREFORE,** undersigned counsel respectfully requests this Court grant this Motion to Withdraw as Counsel of Record for Defendant, ROY AGELOFF, and discharge

PDF
Complete
Click Here & Upgrade
Expanded Features
Unlimited Pages

BRIAN H. BIEBER, ESQ. and HIRSCHHORN & BIEBER, P.A. from all future responsibility in this cause.

Respectfully submitted,

By: s/BRIAN H. BIEBER
Brian H. Bieber
Florida Bar #8140
Hirschhorn & Bieber, P.A.
550 Biltmore Way
Penthouse Three A
Coral Gables, Florida 33134
Email: bbieber@aquitall.com
Telephone: (305) 445-5320
Telecopier: (305) 446-1766

Dated: March 24, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 24, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

s/Brian H. Bieber
BRIAN H. BIEBER

6/19/09

TO: U.S. District Clerk of Court
Eastern District of New York
225 Camdam Plaza East
Brooklyn, New York 11201


RE: Roy Ageloff Defendent CASE NO: 98-1129s(RJD)
Motion For Appointment of Counsel


Dear Clerk of Court;

Enclosed please find one original
Motion, For "Motion For Counsel"
Please Date Stamp File And docket
before the Honorable Court.
Thank you For your Assistance.

Sincerely

Roy Ageloff
Defendent
OCJ /Unit M1F
3723 Vision Blvd
P.O. Box 4970
Orlando, Fl 32802

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CASE NO: 98-1129 S (RJD)

UNIted States of America

Vs

Roy AGELOFF
          Defendant

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JUN 25 2009 ★

BROOKLYN OFFICE

## MOTION FOR COUNSEL

Comes Now Roy Ageloff and files this Motion For the Appointment of CJA Counsel showing the Court as Follows

1

Roy Ageloff (herein After Ageloff) is the Above Named defendant And currently In the custody of the U.S. Marshals

2

Ageloff Anticipates being in custody of the Marshals or Bureau of Prisons (B.O.P.) during the pendency of part or all this case.

PG 1 of 2

In the interests of justice and efficent
Administration of Justice, Ageloff
Respectfully Requests the court Appoint
Counsel.

Without Competent Counsel Ageloff stand
to be Substantially Prejudiced and
lose Significant Rights

wherefor Ageloff Respectfully
Requests the Court to Appoint
Competent Counsel, experienced in
the Areas of Law and issues in
Controversy; For with to Communicate
with Ageloff And protect Ageloff's
Rights and intrests

Respectfully submitted

By _____
Roy Ageloff
Orange County Corrections
Inmate No: 09021855
P.O. Box 4970
3723 Vision Blvd
Orlando, Fl 32802

Ray Aseloff 09081855
SHOUT M1G
P.O. Box 4970
Orlando, Fl 32802

LESAL MAIL

ORLANDO FL 328
22 JUN 09 PM 2 L

CLerk of CourT
UNITED STATES DisTRicT CourT
EasTern DisTRicT of New York
225 CAMdAM PlazA East
Brooklyn, New York 11201

LESAL MAIL

98-cr-1129

UNITED STATES DISTRICT COURT
Eastern District of New York

CASE NO: 98-1129s (RJD)

United States of America

VS

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ AUG 13 2009 ★
BROOKLYN OFFICE

Roy Ageloff
                    Defendant

## MOTION FOR COUNSEL

Come Now Roy Ageloff And Files this Motion For the Appointment of CJA Counsel showing the Court As Follows

1

Roy Ageloff (here in After Ageloff) is the Above Named Defendant and currently IN the Custody of the U.S. Marshals

2

Ageloff Anticipates being in Custody of the Marshals of Bureau of Prisons (B.O.P.) during the pendency of part or All this CASE

Pg 1 of 2

3

In the Intrests of Justice and efficent administration of Justice Aceloff Respectfully Requests the Court Appoint Counsel

4

Without Competent Counsel Aceloff stands to be Substantially prejudiced And lose Significant Rights

Wherefor Aceloff Respectfully Requests the Court to Appoint Competent counsel experience in the Areas of Law and issues in Controversy; for With to Communicate with Aceloff and protect Aceloff's Rights And Intrests

Respectfully Submitted

By Ag

Roy Aceloff

To: U.S. District Clerk of Court                    8/1/09
Eastern District of New York
225 Camdam Plaza East
Brooklyn, New York 11201


RE: Roy Aceloff Defendent Case No: 98-1129 (RJD)
Motion For Appointment of Councel


Dear Clerk of Court


Enclosed Please Find one Original
Motion For " Motion For Councel" Please
Date Stamp File and Docket before
the Honorable Court, Thankyou For
your Assistance.



                                    Sincerly

                                    [signature]

                                    Roy Aceloff
                                    Defendent
                                    Orange County Jail
                                    # 09021855
                                    Unit M16
                                    3723 Vision Blvd
                                    P.O. Box 4970
                                    Orlando, Florida 32802

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - X
 3
        UNITED STATES OF AMERICA,    :   98-CR-1129(RJD)
 4                                   :
                                     :   U.S. Courthouse
 5                                   :   Brooklyn, New York
            -against-               :
 6                                   :   TRANSCRIPT OF
                                     :   HEARING
 7                                   :
                                     :
 8      ROY AGELOFF,                 :   June 1, 2010
                                     :   11:30 a.m.
 9              Defendant.           :
                                     :
10   - - - - - - - - - - - - - X

11   BEFORE:
                    HONORABLE RAYMOND J. DEARIE, CHIEF JUDGE
12
     APPEARANCES:
13
     For the Government:        LORETTA E. LYNCH, ESQ.
14                              United States Attorney
                                271 Cadman Plaza East
15                              Brooklyn, New York 11201
                                BY:  DANIEL SPECTOR, ESQ.
16                                   Assistant U.S. Attorney

17

18   For the Defendant:        SCOTT FENSTERMAKER, ESQ.

19

20

21   Court Reporter:          Holly Driscoll, CSR
                               Official Court Reporter
22                             225 Cadman Plaza East
                               Brooklyn, New York 11201
23                             (718) 613-2274

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by Computer-Assisted Transcript.
```

2

1          THE CLERK:  We are on this morning for a hearing,
2   this is USA versus Roy Ageloff, docket number CR-98-1129.
3   This is defendant number eight.
4          Can I ask the attorneys please to note their
5   appearances beginning with counsel for government.
6          MR. SPECTOR:  Good morning, Your Honor, Daniel
7   Spector for the government.
8          THE COURT:  Good morning.
9          MR. FENSTERMAKER:  Good morning, Your Honor, Scott
10  Fenstermaker for Mr. Ageloff.  Your Honor, I'm sorry I was
11  late today, I was over in state court, I wasn't released until
12  11, I came straight here and I apologize for the delay.
13         THE COURT:  No apology necessary.  Good morning.
14  And good morning, Mr. Ageloff.
15         THE DEFENDANT:  Good morning to you, Judge Dearie.
16         THE COURT:  All right.  We're here for a limited
17  purpose today which is to address the issue of Mr. Ageloff's
18  qualifications for CJA counsel and related services.  How do
19  we proceed?  Sir?
20         MR. FENSTERMAKER:  Your Honor, we can proceed
21  however you like.  I understand that the defendant has the
22  burden here.  I'd just like to point out something, Your
23  Honor.  I handed up a book of exhibits which is basically
24  transcripts and some court filings in Mr. Ageloff's Florida
25  case and one thing I wanted to point out, Your Honor, is that

1    in Mr. Ageloff's Florida case as of I think October 30th of

2    2008 he was deemed qualified for CJA counsel at that stage,

3    Your Honor, and I would argue that there is, at least with

4    respect to his status as of October 30th of 2008, that there

5    would be some preclusive effect to the Court revisiting

6    whether or not he was qualified for CJA counsel at that stage

7    and that the only purpose of this hearing today is to

8    determine whether there is a change in status between

9    October 30th of 2008 and today which would, as a result of

10   that change in status, would make Mr. Ageloff no longer

11   eligible for CJA counsel.

12          Certainly, I don't know if the Court is willing to

13   make a ruling to that effect right now, but my argument is

14   going to be at least as of October 30th of 2008 that

15   Mr. Ageloff was qualified and, therefore, the limited scope of

16   this hearing should be with respect to any facts that may have

17   occurred subsequent to that date.

18          THE COURT:  Well, this is the first I'm hearing

19   about the issue.  It doesn't -- my gut reaction, frankly, is

20   that I'm not bound by the determination of the Florida court.

21   It certainly is a factor to consider.  I don't know what was

22   before that court in considering it, presumably an affidavit

23   of indigency.  Do we, by the way, have one in this case?  I

24   asked that last time.

25          MR. SPECTOR:  I don't believe there was ever one

4

1    filed, at least since I've been on the case for the purposes

2    of the remand from the circuit.  My recollection is when I

3    first appeared on the case Mr. Ageloff had retained or had at

4    some point been represented by Mr. Bieber.  We had a telephone

5    conference where the Court relieved Mr. Bieber and appointed

6    Mr. Fenstermaker.  My recollection is at that point the

7    defendant was still in Florida custody and appeared by phone,

8    although I might be confusing that.

9         THE COURT:  There have been so many of them, I don't

10   recall.  I do recall Mr. Ageloff on the phone at one point.  I

11   also recall Mr. Bieber on the phone but, no, I don't see why I

12   would be bound by it but I think, as I said, I think it is a

13   relevant consideration.  If the court made what that court

14   believed to be an informed judgment, presumably it did, it is

15   a factor that the court should and will consider.  And with

16   that, let's proceed.

17        MR. FENSTERMAKER:  All right, Your Honor, the

18   defense calls Mr. Roy Ageloff.

19        THE COURT:  All right.  Come on over and have a

20   seat, Mr. Ageloff.

21        I assume you fellows would be more comfortable

22   sitting.

23        DEPUTY MARSHAL:  Yes, Judge.

24        THE COURT:  Sorry, the date again, Mr. Fenstermaker;

25   October 30, is that the date?

*Ageloff - direct - Fenstermaker*                                5

1          MR. FENSTERMAKER:  I'll double-check it, Your Honor.

2     I believe it is October 30th.  I've got the transcript right

3     here.

4               It is October 30th, 2008.

5               THE COURT:  Exhibit F in the exhibits that you've

6     just provided.  Okay.  Thank you.

7               (Defendant sworn by the clerk.)

8     R O Y     A G E L O F F, having been first duly

9     sworn was examined and testified as follows:

10              THE CLERK:  State and spell your name for the

11    record.

12              THE WITNESS:  Roy Ageloff, R O Y, A G E L O F F like

13    Frank.

14              THE COURT:  All right, Mr. Fenstermaker, all yours.

15              MR. FENSTERMAKER:  Thank you very much, Your Honor.

16    DIRECT EXAMINATION

17    BY MR. FENSTERMAKER:

18    Q    Good morning, Mr. Ageloff.  How are you?

19    A    Good morning to you, sir.

20    Q    Sir, are you currently employed?

21    A    No.

22    Q    Can you please state your current place of residence?

23    A    MDC Brooklyn.

24    Q    Are you an inmate in the MDC Brooklyn?

25    A    Yes, I am.

*Ageloff - direct - Fenstermaker*                                6

1   Q     How long have you been an inmate in the United States

2   Bureau of Prisons custody?

3   A     August 15th -- this coming August 15th will be nine

4   years.

5   Q     Since August 15th of 2001 have you had any employment

6   outside of the Bureau of Prisons?

7   A     No.

8   Q     Have you had any employment in the Bureau of Prisons?

9   A     Yes.

10  Q     Can you please describe -- briefly describe your

11  employment in the Bureau of Prisons?

12  A     Rec yard orderly, unit orderly, that's basically it.

13  Q     Can you briefly describe your yearly annual income for

14  the last three years?

15  A     I mean I'm guessing, it's basically approximately $5 a

16  month.

17  Q     So, does that come up to about $60 a year?

18  A     Approximately 60.

19  Q     Have you filed any federal or state income tax returns

20  since you've been in custody?

21  A     No.

22  Q     When was the last time you filed?

23  A     Actually I take that back, I did file I think an

24  amended -- I filed something to the IRS I want to say in I

25  believe 2008.

Ageloff - direct - Fenstermaker                        7

1   Q     Okay.

2   A     And it was for -- it was from interest I had earned from

3   years before.

4   Q     Okay.  What years was that interest attributable to?

5   A     Again I'm guessing, I think from '01 to '08 if I'm not

6   mistaken.

7   Q     How much interest did you earn during those years?

8   A     Offhand I'm going to say approximately, again I'm

9   guessing, 3, $400,000.

10  Q     Do you still have custody and control of that interest in

11  any way?

12  A     No.

13  Q     Where is that interest, if you know?

14  A     The interest has been depleted and if there was

15  anything -- the interest has been depleted.

16  Q     Can you please describe for Judge Dearie how the interest

17  has been depleted?

18  A     Over the years that interest was utilized to support my

19  family.

20  Q     Okay.  When you say during those years, you're talking

21  about 2001 through 2008?

22  A     2001 through '07, maybe it was '07 I believe.  I think it

23  was '07.

24  Q     And do you have any current assets that you presently

25  own?

*Ageloff - direct - Fenstermaker*                                8

1   A     That I presently own, no.  The only thing that -- the

2   only asset I can say is partial insurance monies that belong

3   to my children.

4   Q     Okay.  When you say it belongs to your children, can you

5   describe their ownership interest in that?

6   A     Yeah, it was a policy that was purchased I believe in the

7   1980's and being that there was no way to continue the support

8   of this policy, it was liquidated, it was liquidated for the

9   purposes so that the children -- my children can have

10  something at this point because that's all they have.

11  Q     All right.  When you say it was liquidated, is it in your

12  name, is it in your children's name?

13  A     No, it's in a trust for my children.

14  Q     What kind of trust is it in?

15  A     I believe it's an irrevocable trust.

16  Q     Are you a beneficiary of that irrevocable trust?

17  A     No.

18  Q     Are you a trustee of that trust?

19  A     A trustee, no.

20  Q     Do you have any interest in that trust whatsoever other

21  than having created it?

22  A     There's a title for it, I wasn't the trustee and I'm not

23  the beneficiary.

24          THE COURT:  Guardian?

25          THE WITNESS:  Guardian, thank you.

*Ageloff - direct - Fenstermaker*                                    9

1   Q      Okay.

2          THE COURT:  Just so I understand it, so the monies

3   in that account, this trust account were accumulated by virtue

4   of your having liquidated an insurance policy or policies?

5          THE WITNESS:  Policy.  It might be -- a term life

6   and a whole life I believe it was.

7          THE COURT:  And you took the proceeds of that

8   liquidation, put them in trust for your kids?

9          THE WITNESS:  No, the trust was originated -- in

10  fact, if I remember correctly, it was talked about in this

11  very court, I don't know if it is the same courtroom but here

12  in front of you in fact in 2001; the proceeds to open the

13  trust were used I believe for the sale of my home at the time.

14         THE COURT:  Okay.

15         THE WITNESS:  Since then during my incarceration the

16  insurance policy was sold.

17         THE COURT:  And those proceeds went into that

18  account?

19         THE WITNESS:  Remained in that account, correct.

20         THE COURT:  Once the insurance company cut you a

21  check for the cash value of the policies, that check went into

22  this trust account?

23         THE WITNESS:  No, I don't believe that's how it

24  worked.  You have an insurance policy that's already -- that

25  was already in the trust for the children, so the trustee,

*Ageloff - direct - Fenstermaker*                    10

1   whatever he did in terms of liquidating, again I'm speculating

2   that that's what took place, he -- that the policy was sold

3   and the proceeds remained in the very same account.

4           THE COURT:  Okay.

5   Q   Okay.  Has any money or any other property that's

6   contained in that trust ever been used for your benefit?

7   A   I don't believe so.

8   Q   Who is the trustee of that?

9   A   An attorney by the name of David Schottenfeld.

10  Q   Now, sir, did there come a time that you were arrested on

11  a money laundering allegation in Florida?

12  A   Yes.

13  Q   There's a bound book in front of you containing a number

14  of exhibits on your left.  I'd like to direct your attention

15  to Exhibit A in that book.

16          Do you recognize Exhibit A?

17  A   Yes.

18  Q   What do you recognize that to be?

19  A   A Florida indictment.

20  Q   Is that the same Florida indictment which was your

21  accusatory instrument in your Florida case?

22  A   Yes.

23  Q   Is that Florida case indictment number 32 of 2008 in the

24  Middle District of Florida?

25  A   Yes.

*Ageloff - direct - Fenstermaker*                    11

1  Q    Are those the same charges and forfeiture allegations

2  that were contained in your Florida case?

3  A    I believe so.

4  Q    All right.  Now, did there come a time that you attempted

5  to hire private counsel to represent you in your Florida case?

6  A    Yes.

7  Q    When I say "Florida case," I'm referring to the

8  indictment that I just mentioned.

9  A    Yes.

10 Q    Can you please briefly describe for Judge Dearie what

11 happened when you to hire a private counsel in your Florida

12 case?

13 A    Yes, if I recall correctly, the magistrate judge would

14 not allow the liquidation -- not the liquidation, excuse me,

15 he wouldn't release any of the monies that were confiscated in

16 the Florida case to allow me to represent -- to allow me to

17 hire the attorney of my choice or any attorney privately.

18 Q    You mentioned that there were monies seized; can you

19 please briefly describe the monies seized?

20 A    There was my parents' home that was seized.

21        THE COURT:  I'm sorry, did you say home?

22        THE WITNESS:  Home, yes, sir.  There was cash that

23 was seized.  I mean it should be in here.  And properties I

24 believe.

25 Q    Okay.  What was the name of the attorney that you tried

1   to hire?

2   A    Jack Maro.

3   Q    And what was Mr. Maro's stated fee for representing you

4   in the Florida case?

5   A    If I remember correctly, I think the entire fee was --

6   what he requested was $80,000 and I believe 50 was for the fee

7   and 30 was for other expenses, private investigator and so on.

8   Q    Now, when you were attempting to hire Mr. Maro for your

9   Florida case, what was your understanding of the maximum

10  potential penalty that you faced in the Florida case?

11  A    I believe it was 20 years.

12  Q    All right.  And was that a significant potential

13  punishment for you?

14  A    Yes.

15  Q    Okay.  So, in other words, you wanted to hire a private

16  counsel, correct?

17  A    Correct.

18  Q    Okay.  Was there a point in time that the court in

19  Florida assigned counsel to you?

20  A    Yes.

21  Q    Did the court initially assign a federal public defender

22  to you?

23  A    Yes.

24  Q    Can you please describe for the Court what happened when

25  the court assigned a federal public defender for you?

*Ageloff - direct - Fenstermaker*         13

1  A    I'm trying to recall exactly what happened.  We had a

2  conflict with one of them and he was removed from the -- from

3  representing me.

4  Q    When he was removed from representing you did you

5  continue to try and hire counsel in Florida?

6  A    Yes.

7  Q    Okay.  Did there come a time that you filed a motion with

8  the court, a written motion with the court asking for the

9  release of some of the funds that were seized?

10  A    Yes.

11  Q    I'm going to ask you to turn your attention to Exhibit B

12  in that book.

13  A    Okay.

14  Q    Okay.  Do you recognize the document that is Exhibit B?

15  A    Yes.

16  Q    What do you recognize that document to be?

17  A    This was a motion that was sent to the court for --

18  requesting a hearing as to the seized funds in order to gain

19  some type of access for a private attorney.

20  Q    So, in other words, is it fair to summarize that motion

21  as being you asking the court to release some of the money

22  that was seized so you could pay Mr. Maro?

23  A    I believe so.

24        MR. FENSTERMAKER:  Your Honor, at this time I'd like

25  to admit Exhibits A and B into evidence in this hearing with

*Ageloff - direct - Fenstermaker*                          14

1   the Court's permission.

2              THE COURT:  All right.  Any objection?

3              MR. SPECTOR:  No objection, Judge.

4              THE COURT:  Received, A and B now in evidence.

5              (Defendant's Exhibits A and B received in evidence.)

6   Q    Okay.  Can you please briefly describe for Judge

7   Dearie -- withdrawn.

8              Did an attorney file Exhibit B for you or did you

9   file that on your own?

10  A    I had received some -- this was ultimately done by

11  myself.  I sent this in myself.

12  Q    Did you write that motion?

13  A    This is not my handwriting.  I received some help in

14  doing this, in writing this.

15  Q    All right, but did you submit that through an attorney or

16  through yourself?

17  A    Myself.

18  Q    Why did you submit this motion?

19  A    If I recall, I didn't have much of a choice.  I submitted

20  this motion on the hope that I'd be able to have some of the

21  monies released that were seized so that I can retain Jack

22  Maro.

23  Q    At the time that you filed that motion did you, outside

24  of the monies that were seized and outside of the monies that

25  are on deposit in the United States District Court for the

*Ageloff - direct - Fenstermaker*                                  15

1  Eastern District of New York currently, did you have any other

2  money or property that you had access to?

3  A    Can you repeat that, I'm sorry.

4  Q    Okay.  Other than the funds that were seized in your

5  Florida case and the approximately $536,000 that are on

6  deposit with this court, the United States District Court for

7  the Eastern District of New York from the restitution,

8  potential restitution obligation, did you have any access to

9  any property outside of those funds?

10 A    No.

11 Q    Okay.  Would you have been able to pay a portion of

12 Mr. Maro's $80,000 fee?

13 A    Without the proceeds that were seized?

14 Q    Without a court granting the motion that is Exhibit B?

15 A    No.

16 Q    Okay.  Now, can you please briefly describe what happened

17 with respect to your request for a hearing and the ultimate

18 results of your attempt to have monies released?

19 A    My understanding was on October 30th of 2008 there was a

20 hearing for reconsideration to receive the -- gain some access

21 for private counsel and the magistrate explained that in the

22 Eleventh Circuit -- that in the Second Circuit they would

23 release funds in a situation like this but although the

24 Eleventh Circuit was going through some changes, that they

25 would not release the monies.  With that he appointed -- the

*Ageloff - direct - Fenstermaker*                                16

1  magistrate appointed an attorney for the purpose, my

2  understanding, to conduct a hearing to release some of these

3  monies for the purposes of retaining attorney Jack Maro.

4  Q    What was the name of that attorney that he appointed?

5  A    Daniel Broderson.

6  Q    All right.  Did Mr. Broderson ultimately represent you

7  through the conclusion of the case?

8  A    Yes.

9  Q    And did Mr. Broderson ever bring an application for a

10 hearing similar to the application you made that is Exhibit B

11 in evidence?

12 A    No.

13 Q    Okay.  If you know, do you know why he did not bring

14 that?

15 A    No.

16 Q    Was the potential application for the release of the

17 seized funds to pay another attorney who might replace him as

18 CJA counsel?

19 A    Yes.

20 Q    If you know, was Mr. Broderson subsequently suspended

21 from the practice of law?

22       MR. SPECTOR:  Objection, relevance.

23 A    Yes.

24       THE COURT:  I'll permit it.

25 Q    Okay.  Do you know why he was suspended from the practice

*Ageloff - direct - Fenstermaker*                                    17

1   of law?

2   A    I believe it was misrepresentation and lying to the

3   court.

4   Q    Okay.  If you know, did that allegation have anything to

5   do with you?

6   A    No.

7   Q    Did Mr. Broderson represent you through the conclusion of

8   your plea in your Florida case?

9   A    Yes.

10  Q    Did the court ever make a determination in Florida that

11  you had sufficient funds to hire private counsel?

12  A    Yes.

13  Q    The court made that determination that you had sufficient

14  funds to hire private counsel?

15  A    As far as I understand, yeah, yes.  I would have to say

16  yes.

17  Q    Then why did the court appoint Mr. Broderson?

18  A    My understanding is that, again, Mr. Broderson was

19  appointed to represent me in a hearing that would take place

20  for the purposes of whether the magistrate would in fact

21  release monies or not.

22  Q    So, which funds did the court determine you had -- made

23  you ineligible for appointed counsel?

24  A    I don't follow your question.

25  Q    You just said the court made a determination that you

*Ageloff - direct - Fenstermaker*                               18

1   were ineligible.

2   A     Oh, ineligible, I apologize, I apologize.  I

3   misunderstood you, I'm sorry.  I'm sorry.  It's my

4   understanding that the court agreed that there were funds

5   available that I can use but wouldn't allow me to.

6   Q     So, when you say that the court said that you could use

7   them but wouldn't allow you to, are you talking about the

8   seized funds?

9   A     Correct.

10  Q     And did the court ever issue an order directing the

11  government to release funds for you to pay private counsel?

12              THE COURT:  Or the Clerk of the Court?

13              THE WITNESS:  Not that I'm aware of.

14  Q     Okay.

15  A     Can you repeat that, I'm just a little fatigued here.

16  Q     My question probably wasn't articulately stated here.

17              So, in other words, did the court say that you were

18  required to hire your own attorney because you had the money

19  available to do so?

20  A     Yes, the court a number of times asked me if I had the

21  ability to retain counsel of my choice.

22              THE COURT:  You had the ability but because the

23  court wouldn't release the funds, you couldn't implement that

24  ability.

25              THE WITNESS:  That's correct.

*Ageloff - direct - Fenstermaker*                    19

1      THE COURT:  Okay.  I think we understand where we're

2  at.

3      MR. FENSTERMAKER:  Yes, Your Honor.

4      THE WITNESS:  I apologize, Judge.

5  Q   So, outside of the seized funds and the money on deposit

6  with the Clerk of the Court here in Brooklyn, you don't have

7  any other assets now or then, correct?

8  A   Correct.

9  Q   Okay.  Now, did there come a time that you were

10 ultimately convicted in your Florida case?

11 A   Yes.

12 Q   And briefly describe for the Court what your sentence

13 was?

14 A   Sixty months.

15 Q   Did there come a time that you filed a notice of appeal

16 in that case?

17 A   Yes.

18 Q   Okay.  Can you please briefly describe what happened with

19 respect to your attempt to hire counsel for your appeal to the

20 Eleventh Circuit?

21 A   Well, I was first appointed an attorney by the name of

22 John Fernandez, if I remember correctly, John Fernandez.  It

23 took months to try to get some help to finally be able to

24 retain Jack Maro.

25 Q   What happened when Mr. Fernandez was appointed, did he do

*Ageloff - direct - Fenstermaker*                    20

1  anything on your behalf?

2  A    No.

3  Q    Did he file a brief with the Eleventh Circuit?

4  A    He filed a -- you know, I'm not sure if he filed -- I'm

5  not sure if he actually ever did file a brief.

6  Q    Okay.  Did he tell you that he was going to file a brief?

7  A    Yes.

8  Q    What did he tell you he was going to file?

9  A    He told me he was going to file a brief that wouldn't be

10  very helpful to me.

11  Q    Was it called an Anders brief?

12  A    Yes.

13  Q    Okay.  Once you learned that Mr. Fernandez was planning

14  on filing an Anders brief on your behalf, what did you do?

15  A    I did everything I possibly could to touch base with Jack

16  Maro and update him on my situation and he said he would do

17  whatever he can to help me, that he actually felt bad and with

18  very little time left I was able to retain him.

19  Q    All right.  Can you please briefly describe the nature of

20  your retainer agreement with Mr. Maro for the Eleventh Circuit

21  brief?

22  A    As far as I recall, I think it was $22,000 was the

23  retainer agreement.

24  Q    And how much, if you know, of that was paid?

25  A    I'm not 100 percent sure but I think it is approximately

*Ageloff - direct - Fenstermaker*                       21

1  half.

2  Q    Okay.  And how much of that one-half of 22,000 did you

3  pay?

4  A    Nothing.

5  Q    Who paid that on your behalf?

6  A    My cousin Jennifer I know chipped in, my friend Scott

7  chipped in, and I believe my friend Joe had chipped in.

8  Q    Okay.  Were any of those three people that you just

9  mentioned holding monies on your behalf?

10 A    No.

11 Q    Had you ever given them any monies in the understanding

12 that they were going to use it for your benefit at some point?

13 A    No.

14 Q    Were the monies that they paid Mr. Maro, were they loans

15 or gifts or how were they characterized?

16 A    Just help.

17 Q    Okay.  Now, again, what properties do you have available

18 to you at this stage in order to pay for private counsel in

19 this case?

20 A    The only property that I have is some storage -- very

21 little.

22 Q    When you say "storage," can you describe it?

23 A    There's storage from the house that my parents had out in

24 Long Island.

25 Q    And when you say "storage," can you please briefly

*Ageloff - direct - Fenstermaker*                                22

1  describe the nature of the items that are stored?

2  A    Old furniture, pictures, mostly personal items, TVs,

3  stereo, that's pretty much it.

4  Q    If you could give the Court a brief estimate of the value

5  of the items in storage?

6  A    I mean it's just -- a pure guess, $15,000, $20,000 but

7  there's approximately 90 -- I think $9,600 -- I'm going to say

8  approximately $9,000, to my understanding, that's owed to the

9  storage people.

10 Q    At this stage can you even take the items out of storage?

11 A    No.

12 Q    Why not?

13 A    I don't have the money to pay for it.

14 Q    Pay for what?

15 A    To pay the storage people to get everything out of

16 storage.

17 Q    Would you like to hire a private counsel in this case?

18 A    Yes.

19 Q    Do you have the money to do so?

20 A    No.

21         MR. FENSTERMAKER:  Your Honor, I have no further

22 questions.  Thank you.

23         THE COURT:  All right.  Thank you, sir.

24         (Continued on next page.)

25

R. Ageloff - Cross / Spector                    23

1        THE COURT:  Could you hold on one second?

2        MR. SPECTOR:  Sure, your Honor.

3        (Pause in the proceedings.)

4        THE COURT:  Go right ahead.

5        MR. SPECTOR:  Thank you, your Honor.

6   CROSS-EXAMINATION

7   BY MR. SPECTOR:

8   Q    Good afternoon, Mr. Ageloff.

9   A    Good afternoon to you.

10  Q    I'd like to start just to ask a few questions about the

11  retainer you have for Mr. Maro for his representation of you

12  on appeal.

13       Can you just tell us again for the record who are

14  the people who paid Mr. Maro's legal fee?

15  A    My cousin Jennifer.

16  Q    What's her full name?

17  A    Jennifer Lifton.

18  Q    And she's your first cousin?

19  A    Yes.

20  Q    What portion did she pay?

21  A    I'm not sure.

22  Q    And who are the other individuals?

23  A    Joe, and I can't recall his last name.  And I can provide

24  the information.  And Scott Smilon [ph].

25  Q    It was only those three, as far as you understand, who

R. Ageloff - Cross / Spector                    24

1  paid the fees?

2  A    Yes.

3  Q    With respect to Mr. Smilon, how do you know him?

4  A    I know Scott since I'm five years old.

5  Q    And what about Joe?

6  A    Joe I know since nineteen -- 1994, I'm going to say.

7  Q    You've known him since 1994, but you don't know his last

8  name?

9  A    No, he was -- no, I don't know his last name offhand.

10 Q    And how did it come about that these three individuals

11 agreed to pay your legal fees?

12 A    When John Fernandez, attorney John Fernandez, informed me

13 that he was filing this Anders brief and Jack told me what he

14 want -- you know, the fee that he wanted and if I can come up

15 with whatever I can come up with, you know, he would work with

16 me.  And I reached out to my cousin Jennifer and Jennifer

17 had -- Jennifer has very little money and she was -- wanted to

18 do whatever she can to help me, and she had money that was

19 from her father had passed away that she wanted to -- that she

20 insisted on helping with.  So she did whatever she could.

21       Joe had a -- a car that I had, it's an old 1986

22 Porsche that was, I think, needed a transmission, motor.

23 Basically a -- I guess they -- it's old, you know, just not

24 running or anything like that.  And he was helping me with

25 that car to get fixed so I can get whatever proceeds from the

R. Ageloff - Cross / Spector                    25

1  car to get to Jack.

2  Q    So, when you testified earlier that Joe, Scott, and

3  Jennifer never held any property for you, on direct

4  examination you were asked that question, remember being asked

5  that question?   Do you remember being asked that question on

6  direct?

7  A    Yes.

8  Q    Your answer was no, that they had no -- did not hold any

9  property for you, correct?

10  A    Well, Joe is --

11  Q    Excuse me.  Do you remember answering that question "no"?

12  A    Yes, I do.

13  Q    But, in fact, you now testified that Joe held a 1986

14  Porsche for you, correct?

15  A    He was not holding it.  He picked it up for me from where

16  it was being held, held it in storage for me until it could

17  get fixed so we could try and sell the car.

18  Q    It's your car that he's now in possession of, correct?

19  A    I don't believe he's in possession of the car any longer.

20  Q    Well, he was in possession of it at the time?

21  A    Correct.

22  Q    And how much did he sell the car for?

23  A    I'm not sure, but I -- I think the car was valued

24  between, and I'm guessing, between five and seven thousand

25  dollars.

R. Ageloff - Cross / Spector                26

1    Q    Is Joe holding any other type of property for you?

2    A    No.

3    Q    Does Joe have access to any types of property --

4    A    No.

5    Q    -- that you have an interest in?

6    A    Absolutely not.

7    Q    And what about Jennifer?

8    A    No.

9    Q    Now, with respect to Scott.

10            THE COURT:  Excuse me.  I'm a little confused.

11            Is this a different Joe, or is this the same Joe

12   we've been talking about?

13            THE WITNESS:  It's the same gentleman.

14            THE COURT:  And you don't know his last name?

15            THE WITNESS:  No, I don't.  I can't recall his last

16   name.

17   BY MR. SPECTOR:

18   Q    What about Mr. Scott Smilon?

19   A    Okay.

20   Q    Why don't you explain why it is that he decided to

21   contribute to your legal fees?

22   A    What I did was I was finally able to contact Scott while

23   I was in county jail, explain my situation, and he said that

24   he would help me, that my life was on the line, this was my

25   last opportunity, and he would be able to, you know, to chip

R. Ageloff - Cross / Spector                    27

1    in.

2    Q    And how much did Scott chip in?

3    A    Again, I'm not a hundred percent sure.  I think the total

4    amount is eleven thousand dollars.

5    Q    Was Scott ever involved in any fraud?

6    A    No.

7    Q    Scott was never involved in any securities fraud with

8    you?

9    A    No.

10   Q    Joe was never involved in any securities fraud with you?

11   A    No.

12   Q    Jennifer was never involved in any securities fraud with

13   you?

14   A    No.

15   Q    I want to go back to your testimony about the approximate

16   three hundred, four hundred thousand dollars in interest you

17   had testified about.

18   A    Okay.

19   Q    You said that was interest payments you received,

20   approximately, from 2001 to 2007?

21   A    Correct.

22   Q    And what was the principal that generated that interest?

23   A    The principal that generated that interest was a loan

24   that was made to a Douglas and Irwin Peters in 1998.

25   Q    You loaned money to Douglas and Irwin Peters?

R. Ageloff - Cross / Spector                28

1   A    Correct.

2   Q    How much did you loan them?

3   A    Two point two million dollars.

4   Q    Is that loan still generating interest?

5   A    No. .

6   Q    Was the principal repaid?

7   A    Was the principal repaid?   No.

8   Q    Well, if the principal hasn't been repaid, why is it not

9   generating interest?

10  A    The money was confiscated in Florida.

11  Q    The insurance policy you spoke about.

12          THE COURT:  I'm sorry, let me just interpret.

13          What was confiscated, the money?

14          THE WITNESS:  The loan that was made was

15  confiscated.

16          THE COURT:  The funds that you loaned to the

17  Peters --

18          THE WITNESS:  Correct.

19          THE COURT:  -- was taken from them?

20          THE WITNESS:  I would imagine so.  I would imagine

21  that it was taken from them.

22  BY MR. SPECTOR:

23  Q    Sir, it's your testimony that the two point two million

24  dollars that the Peters owe you was taken from them by the

25  government?

R. Ageloff - Cross / Spector                    29

1   A    Correct.

2   Q    The insurance policy you spoke about, what's the company

3   that issued that policy?

4   A    I don't -- I don't -- I really don't remember.

5   Q    Approximately when was that liquidated?

6   A    I'm not sure.  I mean, ballpark, this past year, I

7   believe.

8   Q    2010?

9   A    Two thousand -- I really don't now.  Maybe 2008, 2009.

10  Q    Okay.  And how much was liquidated?

11  A    I believe approximately fifty thousand dollars.

12  Q    That was after you were indicted in Florida that you

13  liquidated those funds?

14  A    I didn't liquidate those funds.

15  Q    The funds were liquidated after the indictment in

16  Florida?

17  A    I believe so.

18  Q    Where is the trust account?

19  A    In Florida.

20  Q    What institution?

21  A    I don't follow.

22  Q    Is there a financial institution where the money's being

23  held?

24  A    I don't believe so.

25  Q    Well, you spoke of a trust account, correct?

R. Ageloff - Cross / Spector                    30

1   A    Mm-hm.

2   Q    Is that account held in a bank?

3   A    I don't believe so.

4   Q    You don't know where the money physically is?

5   A    I have no idea.

6   Q    You said the trustee's David Schottenfeld?

7   A    Correct.

8   Q    You've been in communication with him?

9   A    No.

10  Q    You've never had any communication with him?

11  A    Sure.

12  Q    What is the last time you spoke to him?

13  A    2006, I believe.  2007.

14  Q    So you've never spoken to him after the liquidation?

15  A    Correct.

16  Q    And this is an insurance policy, again, that you set up

17  for the benefit of your family, correct?

18  A    Correct.

19  Q    And it's now fifty thousand dollars of that policy has

20  now been liquidated?

21  A    I believe so.

22  Q    But it's your testimony you don't know where that money

23  is?

24  A    Well, the money is -- it's in Florida.

25  Q    You don't know what financial institution holds that

R. Ageloff - Cross / Spector                    31

1  money?

2  A    No.

3  Q    You don't even know if there is a bank account where the

4  money is being held?

5  A    Don't know.

6  Q    And you've had no communications with Mr. Schottenfeld

7  since 2007?

8  A    Something like that, correct.

9  Q    You spoke about some monies that were seized in the

10 Florida case.  Do you remember that testimony?   You said your

11 parents' home was seized.

12        Approximately how much was that worth, the equity in

13 the home?

14 A    I believe it was sold for $980,000.

15 Q    And there was cash seized.

16        Approximately how much was that?

17 A    Two point two million.

18 Q    And then there were other properties.

19        What was the value of that, approximately?

20 A    I have no idea.

21 Q    You have no understanding of the additional value of

22 those other properties that were seized?

23 A    No.

24 Q    Now, in the Florida case, as part of your guilty plea,

25 you admitted to laundering a total of approximately five point

R. Ageloff - Cross / Spector                            32

1   seven million; is that correct?

2   A    I don't know if that's correct.

3   Q    Well, there was something called the movie money.

4        Do you remember that term?

5   A    Yes.

6   Q    And that was three point five million?

7   A    Yes.

8   Q    And then there was something called the New Jersey money.

9        Do you remember that term?

10  A    That's the loan.

11  Q    And that was the two point two million dollar loan?

12  A    Correct.

13  Q    So, in addition to the two point two million, there was

14  another at least three point five million involved, correct?

15  A    Not correct.

16  Q    Well, I think you just said that you admitted to, as part

17  of your plea, admitted to laundering the movie money, correct?

18  A    That's correct.

19  Q    And that was three point five million, correct?

20  A    But that's -- it's actually three point three.

21  Q    Three point three million, correct?

22  A    Correct.

23  Q    Okay.  Now, as we sit here today, your brother Michael

24  Ageloff has control of some of those funds, correct?

25  A    I have no idea if he does or if he doesn't.

R. Ageloff - Cross / Spector                    33

1          It's my understanding -- which funds are you

2     referring to?

3     Q     The movie funds.

4     A     No, I don't believe so.

5     Q     Well, isn't it true, sir, that Mr. Ageloff is currently

6     litigating with the U.S. Attorney's office in Florida to try

7     to retain some of those funds back?

8     A     I don't believe so.

9     Q     You have no knowledge of that?

10    A     No.

11          THE COURT:  Retain or recapture?

12          MR. SPECTOR:  Recapture, excuse me.

13    Q     And, sir, it's true that during the time you were

14    laundering funds, you had the ability to direct your brother

15    as to what to do with those funds, correct?

16    A     No, that's not correct.

17          MR. SPECTOR:  May I just have one moment, your

18    Honor?

19          THE COURT:  Yes.

20          (Pause in the proceedings.)

21    Q     Sir, do you remember your sentencing in the Florida case

22    on July 22nd of 2009?

23    A     Yes.

24    Q     Do you remember your attorney saying during those

25    proceedings, and for the record this is page eleven of the

R. Ageloff - Cross / Spector                      34

1   sentencing transcript, referring to you:  "He will readily

2   acknowledge that he was aware that some of the monies were

3   going to his family which were consistent with his desires"?

4   A    That's the interest payments from the two point two

5   million which I -- which I believe I explained that to you

6   already.

7   Q    So your testimony is you only controlled the two point

8   two million, not any of the movie monies; is that right?

9   A    The movie money that you're referring to, the three point

10  five million, was money that I loaned, that I invested to a

11  company called Cutting Edge Entertainment back in 1997, which

12  my brother had nothing to do with back when I made those

13  loans.

14         This is the same company that Judge Dearie, that we

15  disclosed to this Court nine years ago that I was going to

16  liquidate.

17  Q    Let me just stop you.

18         Is it your testimony that you had no control over

19  those funds, the three point five million, yes or no?

20  A    At one time, sure I did.

21  Q    And were all those funds seized by the government, the

22  three point five million?

23  A    The three point five million was --

24  Q    Just yes or no, sir.

25  A    What is the question?

R. Ageloff - Cross / Spector                    35

1  Q    The three point five million dollars, were all of those

2  funds seized by the government?

3  A    I don't know.  I don't know if they were all seized by

4  the government.

5  Q    If you could turn, please, sir, to Exhibit B in that

6  binder in front of you already in evidence.  If you'll turn

7  past your handwritten motion, which is six pages, the second

8  part of Exhibit B you'll see is an order from the Middle

9  District.

10          Just let me know when you've turned to that.  Just

11  turn to the first page.

12          (Pause in the proceedings.)

13  A    Okay.

14  Q    And if you can look at the second paragraph that begins

15  with "also."

16  A    Okay.

17  Q    And the second sentence beginning "Mr. Carey."

18  A    All right.

19  Q    Can you just read that aloud?

20  A    "Mr. Carey was appointed to represent the defendant by

21  the court because the defendant had failed to adhere to the

22  rules and decorum in the court and had engaged in dilatory

23  conduct, which evidence that the defendant intended to attempt

24  to engage in self-representation to advance a personal agenda

25  rather to address the proceedings in the case."

R. Ageloff - Redirect / Fenstermaker                36

1   Q    If you can read the next sentence as well.

2   A    "Further, because the defendant suggested that he had

3   financial ability to retain counsel and if so chose" --

4   Q    You can stop.  That's fine.

5           MR. SPECTOR:  Nothing further.

6           THE COURT:  Anything else, Mr. Fenstermaker?

7           MR. FENSTERMAKER:  Yes, your Honor.

8   REDIRECT EXAMINATION

9   BY MR. FENSTERMAKER:

10  Q    Mr. Ageloff, on cross-examination, you were asked about

11  the principal of the loan to the Peters.

12          If you know, when the Government seized the property

13  related to the loan you made to the Peters, did they seize the

14  principal, or did they seize the promissory note?

15  A    I'm not sure.  I'm not sure if it was the principal or

16  the note.  I just don't know.

17  Q    Do you know if the Peters ever repaid either you or the

18  Government on that promissory note?

19  A    I don't know.  I mean, I know they didn't -- they never

20  repaid me, that much.

21  Q    But you don't know if they ever repaid the Government?

22  A    Correct.

23  Q    Did the Peters ever give you or pay on your behalf

24  anything other than interest payments on that loan?

25  A    No.

R. Ageloff - Redirect / Fenstermaker          37

1  Q    Now, in Florida, were there a number of occasions when

2  you represented to the Court that you had the ability to

3  retain counsel?

4  A    Yes.

5  Q    On June 26th, 2008, did you tell the Court that you

6  believed you had the ability an means to secure counsel?

7  A    I believe I did.

8  Q    Notwithstanding your telling the Court that you had the

9  ability and means to secure counsel, did the judge that day

10 appoint the public defender to represent you over your

11 objection?

12 A    Yes.

13 Q    During that hearing, did the judge who was hearing the

14 case order you to have an attorney present at the next

15 hearing?

16 A    I believe so.

17 Q    Now, was the next hearing after June 26th, 2008 in

18 Florida held on July 3rd, 2008?

19 A    Yes, I believe.

20 Q    During the July 3rd, 2008 status conference, did you

21 again tell the judge you had the means to hire an attorney?

22 A    I believe I did.

23 Q    After you told the judge that you had the means to hire

24 an attorney, did the judge again appoint the public defender

25 over your objection during that same status conference?

R. Ageloff - Redirect / Fenstermaker                    38

1   A    I believe so.

2   Q    At the conclusion of that status conference, did you ask

3   for additional time to find an attorney?

4   A    I believe I did.

5   Q    Did the judge give you an adjournment until July 22nd,

6   2008 to find an attorney?

7   A    I believe so, yes, July 22nd.

8   Q    Did you, in fact, have a status conference on July 22nd,

9   2008?

10  A    I believe so.

11  Q    Was the federal public defender relieved on that date?

12  A    I believe so.

13  Q    Was one of the reasons that the federal public defender

14  was relieved on that date because you, between July 3rd, 2008

15  and July 22nd, 2008, filed a grievance against him with the

16  Florida bar?

17  A    Correct.

18  Q    Once the judge relieved the federal public defender on

19  July 22nd, 2008, did you again ask for more time to obtain

20  counsel?

21  A    I believe I did.

22  Q    Now, on June 26th, 2008, July 3rd, 2008, and July 22nd,

23  2008, is the reasons that you asked for time to secure an

24  attorney because you wanted to hire a private attorney?

25  A    Yes.

R. Ageloff - Redirect / Fenstermaker          39

1   Q    Were you able to hire an attorney between June 26th, 2008
2   and July 22nd, 2008?
3   A    No.
4   Q    Why not?
5   A    I couldn't -- I couldn't -- I didn't have any money.
6   Q    Now, when you mentioned in June 26th, 2008, July 3rd,
7   2008, and July 22nd, 2008, to the court that you had the money
8   to hire counsel, what money were you talking about?
9   A    The money that was seized.
10  Q    What date, approximately, did you file your motion that
11  is Exhibit B in evidence?
12  A    May I look?
13          MR. FENSTERMAKER:  Your Honor, may Mr. Ageloff refer
14  to the exhibit?
15          THE COURT:  Sure.
16          I see a file stamp from the clerk's office of
17  September 16th, 2009, Clerk U.S. District Court, Ocala,
18  Florida.
19          MR. FENSTERMAKER:  Your Honor, when you said 2009,
20  is it possible that because of a weak imprint on the paper
21  that it's actually 2008?
22          MR. SPECTOR:  In fairness, judge, it does appear
23  likely it was 2008.
24          THE COURT:  I think you're right.  I'll certainly
25  take your representation.

R. Ageloff - Redirect / Fenstermaker                    40

1          MR. FENSTERMAKER:  Yes, your Honor.

2    BY MR. FENSTERMAKER:

3    Q    So, after the case was adjourned on July 22nd, 2008, did

4    you file your motion that is Exhibit B in evidence after that

5    date?

6    A    Yes.

7    Q    And can you please describe for Judge Dearie why you

8    filed that motion?

9    A    To try to have the court reconsider releasing funds to

10   retain private counsel.

11   Q    Subsequent to your filing that motion in September of

12   2008, was the next conference that you had in the court on

13   October 30th of 2008?

14   A    Yes, it was.

15   Q    During that court appearance, did you mention to the

16   Court your motion for the release of the funds?

17   A    Yes.

18   Q    Shortly after you mentioned it, did the judge acknowledge

19   and discuss your motion to release the funds?

20   A    Yes.

21   Q    Did you describe for the Court your attempts to hire Jack

22   Maro with some of the released funds?

23   A    Jack Maro was actually in the courtroom at the time, so

24   yes.  Yes.

25   Q    During that court appearance, did you explain to the

R. Ageloff - Redirect / Fenstermaker                 41

1   judge who was hearing the matter that absent the release of

2   the funds, that it would be very, very difficult for you to

3   hire private counsel absent the released funds?

4   A    I believe so.

5   Q    Can you describe for Judge Dearie why it would have been

6   very, very difficult for you to hire Mr. Maro absent the

7   released funds?

8   A    I had no access to any funds.

9   Q    Then why wouldn't you have told the judge that it would

10  have been impossible for you to hire Mr. Maro?

11  A    Because I felt at the time that I would maybe be able to

12  get some help.

13  Q    When you said "help," do you mean somebody would just

14  give you a gift?

15  A    Yeah, from friends, family, somebody.

16  Q    Now, did you also tell the judge on October 30th, 2008,

17  that you simply did not have the ability to hire Mr. Maro

18  absent the release of the funds that you had moved for?

19  A    I believe so.

20  Q    And at that time, did the judge suggest the possibility

21  of appointing Mr. Maro to represent you on a CJA basis for the

22  purpose of the hearing to release the funds?

23  A    I believe so.

24  Q    If you recall, do you remember what the resolution of

25  that was?

R. Ageloff - Redirect / Fenstermaker                42

1   A    Yes, to have an attorney represent me for the purpose of

2   a hearing, whether the court would release funds for the

3   purpose of retaining Jack Maro, attorney Jack Maro.

4   Q    Okay.  But did the judge ultimately appoint Mr. Maro on a

5   CJA basis to represent you for that hearing?

6   A    No.

7   Q    Do you recall why not?

8   A    Yes.  Because Jack Maro -- because, I believe if I

9   recall, that if he went into the case, he'd have to remain

10  throughout the case, if I'm not mistaken.

11  Q    And did he decline to take a CJA appointment for the

12  entire case?

13  A    Yes, he -- correct.  That's correct.

14  Q    And during the October 30th, 2008 hearing, did the judge

15  ultimately determine that you were eligible for CJA-appointed

16  counsel?

17  A    Yes.

18  Q    Subsequent to that time, before you were ultimately

19  convicted and sentenced in that case, did the judge ever

20  readdress and change his decision that you were eligible for

21  appointed counsel?

22  A    I don't follow you.

23  Q    In other words, did the judge do what Judge Dearie might

24  do here and eliminate your ability to have appointed counsel

25  and require that you hire a private counsel?

R. Ageloff - Redirect / Fenstermaker                    43

1   A    No.

2   Q    Did you at any point in time during the pendency of your

3   Florida case have the ability or the funds necessary at your

4   disposal to hire Mr. Maro with his eighty thousand dollar fee?

5   A    No.

6   Q    Again, the case was a case where you were facing twenty

7   years in federal prison?

8   A    Yes.

9   Q    In order to fight that case, did you want to hire Mr.

10  Maro?

11  A    Yes.

12  Q    Were you ultimately able to do so?   Were you ultimately

13  able to do so before your appeal?

14  A    No.

15  Q    Was the reason that you were unable to do so for your

16  Florida trial-level case was because you didn't have the money

17  to do so?

18  A    Correct.

19  Q    And for your appeal, is it your understanding that Mr.

20  Maro was paid approximately eleven thousand dollars at this

21  stage?

22  A    I'm not a hundred percent sure how much exactly he was

23  paid, but approximately.

24  Q    Other than the Porsche that you mentioned from your

25  friend Joe, was any of that money yours?

R. Ageloff - Redirect / Fenstermaker                    44

1   A      No.

2   Q      Do you have any other money, any other money or property

3   of any nature that anybody else is holding for you so that you

4   can pay counsel, or for any other purpose?

5   A      There were people that owed me money.  Again, that was

6   discussed in 2001 which I litigated unsuccessfully to try to

7   recoup this money.

8           So, I don't quite know how to answer that question.

9   Q      The money that people owe you, have you tried to recover

10  that in any way?

11  A      Yes.

12  Q      Can you briefly describe for the Court how you've tried

13  to recover that?

14  A      Litigation.

15  Q      Has any of that litigation been successful?

16  A      No.

17  Q      Did you file a lawsuit against your former partner in the

18  Cutting Edge Entertainment?

19  A      There was a lawsuit filed on behalf of my children and

20  another lawsuit that was being prepared to be filed.

21  Q      Was that lawsuit successful?

22  A      There was a judgment granted, but a very small portion to

23  the judgment, I believe, was paid.

24  Q      And who owns that judgment?

25  A      The Government.

R. Ageloff - Recross / Spector                    45

1   Q    Was it seized?

2   A    Yeah, it was seized.

3        MR. FENSTERMAKER:  No further questions, your Honor.

4   Thank you.

5        MR. SPECTOR:  Briefly, your Honor?

6        THE COURT:  Could you give me just one moment?

7   Bear with me just a second.

8        (Pause in the proceedings.)

9        THE COURT:  Sorry for the interruption.  Go ahead.

10  RECROSS EXAMINATION

11  BY MR. SPECTOR:

12  Q    Mr. Ageloff, you testified just now that as we sit here

13  today, there are people who owe you money; is that correct?

14  A    Correct.

15  Q    In total, how much money is owed to you, approximately?

16  A    Well, there was a John Trovato who I lent, I believe,

17  $125,000 to for a deli.

18  Q    When was that loan?

19  A    1996 or seven.

20  Q    Okay.  We can take them one by one, if that's easier.

21  A    There was my former partner and his attorney, that

22  lawsuit.

23  Q    What's his name?

24  A    David Glasser.  It's hard to say, it's difficult to say

25  how much is owed.

R. Ageloff - Recross / Spector                                46

1          Back in 2001, in front of Judge Dearie, we claimed,

2     we estimated that the value of my percentage of that company

3     was, I think, between six and eight million dollars, of which

4     the only partial payment from the sale of Cutting Edge was

5     five hundred thousand.

6     Q     So it's fair to say, in your view, Mr. Glasser owes you

7     several million dollars?

8     A     I would say so.

9     Q     Okay.  What else?

10    A     There is an attorney by the name of Robert Boudry [ph]

11    who it's hard to say how much he owes because I've always had

12    a difficult time receiving an accounting from him, but he was

13    also part of the lawsuit that was going to be filed against

14    David Glasser.  It was David Glasser.

15    Q     Well, how is it that Mr. Boudry owes you money?

16    A     He was the entertainment attorney that acted on behalf of

17    David Glasser and myself.

18    Q     When was that?

19    A     Ninety-six, ninety-seven, ninety-eight.

20    Q     Approximately how much do you believe Mr. Boudry owes

21    you?

22    A     I would say about a million dollars.

23          THE COURT:  How is it that he owes you a million?

24          THE WITNESS:  Because when I sold my house -- I'm

25    sorry.  When I took out a loan on my house, part of the monies

R. Ageloff - Recross / Spector                    47

1    that I believe are unaccounted for was invested with him, of

2    which I never got back.

3            THE COURT:  So you gave him authority to invest

4    proceeds?

5            THE WITNESS:  I gave him authority to invest

6    proceeds from the sale of my home.

7            THE COURT:  And was that done in any formal way?

8    Were there documents?

9            THE WITNESS:  No.  There was -- there was an

10   original document, if I remember correctly, this is back when

11   it was first done, and part of my lawsuit was the fact that I

12   never had a full accounting, a proper record for this.

13           THE COURT:  Well, do you know how much the house

14   sold for?

15           THE WITNESS:  Yes.  The house ultimately sold for

16   approximately three million dollars.

17           THE COURT:  And it netted -- was there a mortgage?

18           THE WITNESS:  Well, this was the loan that was taken

19   out originally.  There was a loan for, I think, one point

20   five-fifty.

21           THE COURT:  So he netted, essentially, a

22   million-and-a-half dollars from the sale?

23           THE WITNESS:  No, I don't -- I don't --

24           THE COURT:  Well, I'm not telling you.  I'm asking

25   you.

R. Ageloff - Recross / Spector                    48

1          THE WITNESS:  No, I think we're on a different pace.

2          Prior to the house being sold, there was a mortgage

3   that was taken out on the home.

4          THE COURT:  All right.

5          THE WITNESS:  The mortgage that was taken out on the

6   home was invested with this attorney, with this person.  And

7   later the house was sold.

8          THE COURT:  I see.  The proceeds of the mortgage --

9          THE WITNESS:  Correct.

10         THE COURT:  -- were invested with the attorney?

11         THE WITNESS:  Correct.

12         THE COURT:  And the mortgage proceeds amounted to

13  how much?

14         THE WITNESS:  In total, it was -- it was actually

15  two loans, one together.  It was, I believe, one for one point

16  four and one for a hundred and fifty thousand.

17         THE COURT:  That you were able to take out in the

18  property by mortgage?

19         THE WITNESS:  Correct.

20         THE COURT:  And those proceeds were given to the

21  lawyer to invest?

22         THE WITNESS:  I believe a million -- a million --

23  approximately a million was given to the attorney to invest.

24  BY MR. SPECTOR:

25  Q    Anyone else who owes you money?

R. Ageloff - Examination by The Court                    49

1  A     I can't think offhand.

2             MR. SPECTOR:  Nothing further.

3             THE COURT:  What happened to these litigations?  Mr.

4  Fenstermaker asked you what efforts did you undertake to

5  recover some of these monies; you said litigation.

6             What happened to these?   How many lawsuits were

7  there?

8             THE WITNESS:  Two and one about to be filed.

9             THE COURT:  I see.

10            And what happened to the two that were filed?

11            THE WITNESS:  They were dismissed.

12            THE COURT:  Dismissed, do you know why?

13            THE WITNESS:  Time barred.

14            THE COURT:  Time barred, I see.

15            And tell me, if you would, about, I'm not quite sure

16 I understand the loan to the Peters brothers.  You lent them

17 two point two million dollars?

18            THE WITNESS:  Correct.

19            THE COURT:  And what security, if any, did you get

20 for that loan?

21            THE WITNESS:  A promissory note.

22            THE COURT:  A note, I see.

23            And then they started paying interest?

24            THE WITNESS:  The agreement was to receive monthly

25 interest, correct.

R. Ageloff - Examination by The Court          50

1         THE COURT:  And you received it until somehow the

2    Government stepped in?

3         THE WITNESS:  That's correct.

4         THE COURT:  But the principal of the loan remains

5    unpaid?

6         THE WITNESS:  That's also correct.

7         THE COURT:  Now, is this one of the litigations that

8    you began?

9         THE WITNESS:  No.

10        THE COURT:  Have you done anything with respect to

11   the Peters to recoup the two point two million principal?

12        THE WITNESS:  No, sir.

13        THE COURT:  Is there a reason for that?

14        THE WITNESS:  Because the Government -- because the

15   Government seized that money on behalf of the Government, if

16   I'm not mistaken.

17        THE COURT:  They seized the money that you lent to

18   the Peters?

19        THE WITNESS:  Well, the -- I don't know if the

20   actual money was seized, but it's in the -- as part of the

21   forfeiture in Florida, that loan is actually part of the

22   forfeiture.

23        THE COURT:  So, whatever rights you had pursuant to

24   the loan, the Government now stands in your shoes?

25        THE WITNESS:  That's my understanding.

R. Ageloff - Examination by The Court          51

1          THE COURT:  All right.  Bear with me one second.

2          (Pause in the proceedings.)

3          THE COURT:  Now, the appeal that's pending for which

4    you retained counsel for the initial sum of approximately

5    eleven thousand, that's an appeal from your Florida conviction

6    following a plea of guilty?

7          THE WITNESS:  Correct.

8          THE COURT:  Do you know the issues involved in that

9    appeal?

10          THE WITNESS:  Primarily -- primarily I believe it's

11    Sixth Amendment rights.

12          MR. FENSTERMAKER:  Your Honor?

13          THE WITNESS:  I think there's four grounds, if I'm

14    not mistaken.

15          THE COURT:  Does that have to do with the Court's

16    refusal to allow you to retain your own counsel?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Yes, sir.

19          MR. FENSTERMAKER:  Your Honor, I'm sorry to

20    interrupt.

21          I actually have the brief on appeal.  I don't know

22    if the Court wants to look at it.  I didn't intend to produce

23    it.  I don't have a copy for Mr. Spector.  I have it if you

24    want to see it.

25          THE COURT:  That's all right.  Thanks.

R. Ageloff - Re-redirect / Fenstermaker                52

1          Anything else, gentlemen?

2          MR. SPECTOR:  Not from the Government.

3          MR. FENSTERMAKER:  Your Honor, I just wanted to ask

4    a follow-up question on these loans.

5          THE COURT:  Go ahead.

6    RE-REDIRECT EXAMINATION

7    BY MR. FENSTERMAKER:

8    Q    Mr. Ageloff, you mentioned loaning approximately a

9    hundred twenty-five thousand dollars to a John Trovato in

10   1996, I believe it was?

11   A    I think it was ninety -- yeah, I believe it was either

12   ninety-six or ninety-seven.

13   Q    Can you describe what, if any, interaction you've had

14   with respect to Mr. Trovato in your trying to recover that

15   125,000 since then?

16   A    Up until my incarceration, I was told that I'm going to

17   get it, and it never happened.

18   Q    Did you ever file a lawsuit against him?

19   A    No.

20   Q    Were you in New York when you lent that money to him?

21   A    I don't remember.  I don't remember if I was in New York

22   or not.

23   Q    And the reason that you've never tried to recover the

24   money from the Peters is because it is your understanding that

25   you have no legal interest in that money any longer unless you

R. Ageloff - Re-redirect / Fenstermaker                53

1  win on your appeal, correct?

2  A    Correct.

3  Q    And with respect to the monies that you gave to Cutting

4  Edge and to Mr. Robert Boudry, were both of those part of the

5  lawsuit that you filed with respect to Cutting Edge?

6  A    No.  The lawsuit that was being prepared that was very --

7  you know, that wasn't actually filed was -- would have been

8  part of that, would have contained them.

9  Q    Is that lawsuit going to be filed?

10 A    I don't know if -- if I actually can file it.

11 Q    Why don't you know that?

12 A    Because time.  You know, I don't know the -- the rules

13 or, you know, statute of limitations pertain to this lawsuit.

14 Q    When did you give him the proceeds from the mortgage?

15 A    I'm trying to recall.

16 Q    Was it before you were incarcerated on this case?

17 A    Oh, yeah.  Yeah.

18       MR. FENSTERMAKER:  No further questions, your Honor.

19 Thank you, very much.

20       THE COURT:  Thank you.

21       Anything else?

22       MR. SPECTOR:  Nothing further, your Honor.

23       THE COURT:  You can step down, Mr. Ageloff.

24       (Defendant leaves the witness stand.)

25       THE COURT:  Well, gentlemen, you have me in a

Proceedings                                              54

1    quandary here.  This is a position I've never been in.  And
2    until we resolve this, it's bogging me down.
3           So I need to take a day or two at the most, consider
4    Mr. Ageloff's testimony.
5           I take it there's no other witnesses we're going to
6    hear from?
7           MR. SPECTOR:  None from the Government.
8           MR. FENSTERMAKER:  None from the defense, your
9    Honor.
10          THE COURT:  And as soon as I do, later this week
11   you'll hear from me with some follow-up in terms of all the
12   outstanding matters, including the one that was filed last
13   week.  I will not keep you waiting.
14          MR. FENSTERMAKER:  Your Honor, I just have one brief
15   application.
16          THE COURT:  Go right ahead, sir.
17          MR. FENSTERMAKER:  Pursuant to the case called
18   United States versus Harris, 707 Fed 2d 653, I would ask that
19   the Court if the Court issues an order terminating my
20   appointment as CJA counsel that you stay that order simply to
21   allow me to file a notice of appeal on Mr. Ageloff's behalf.
22          I believe this issue is the type of issue --
23          THE COURT:  Makes sense to me.
24          MR. FENSTERMAKER:  Is that okay, your Honor?
25          THE COURT:  Makes sense to me.

Proceedings                                      55

1          MR. FENSTERMAKER:  Thank you, very much, your Honor.

2          THE COURT:  Okay.

3          Anything else?

4          MR. SPECTOR:  Not from the Government, judge.

5          Based on what you've just said, I'm going to presume

6    that we'll wait to respond to this recent motion.

7          THE COURT:  Yes.  I'll get back to you this week,

8    for sure.

9          MR. SPECTOR:  Thank you.

10         MR. FENSTERMAKER:  Thank you, very much, your Honor.

11         THE DEFENDANT:  Thank you.

12         (Defendant remanded.)

13         (Time noted:   12:46 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

THE LAW OFFICES OF
## SCOTT L. FENSTERMAKER, P.C.
100 PARK AVENUE, 16TH FLOOR
NEW YORK, NEW YORK 10017
TELEPHONE (212) 302-0201

OF COUNSEL
———
LINDA F. FENSTERMAKER, ESQ.

CELL (917) 817-9001
FACSIMILE (212) 302-0327
EMAIL scott@fenstermakerlaw.com
TWITTER @fensterlaw
www.fenstermakerlaw.com

WESTCHESTER OFFICE
BY APPOINTMENT ONLY
50 MAIN STREET
WHITE PLAINS, NEW YORK 10606
TELEPHONE (914) 725-0955

July 7, 2010

### VIA ECF AND FIRST CLASS MAIL

The Honorable Raymond J. Dearie
United States District Chief Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *United States v. Roy Ageloff*, 98-1129S (RJD)

Dear Chief Judge Dearie:

I represent Roy Ageloff, 98-1129S (RJD), and write to request that the Court withdraw the Court's October 9, 2009 Writ of *Habeas Corpus ad Prosequendum* (the "Writ") and permit Mr. Ageloff to be redesignated by the Bureau of Prisons to a Federal Correctional Institution in or near Miami, Florida.[1]  In order to facilitate Mr. Ageloff's request, he waives the right to be physically present for future sentencing proceedings.

### Background

Mr. Ageloff was convicted of one count of racketeering and sentenced to a 96 month prison sentence in August of 2001.  Mr. Ageloff has since served his prison sentence in this matter, although he remains incarcerated on separate charges.  Mr. Ageloff was brought to New York in November of 2009 pursuant to the Writ and has been held at the Metropolitan Detention Center in Brooklyn since November of 2009.  The purpose of the Writ was to secure Mr. Ageloff's attendance at his resentencing pursuant to the Second Circuit's April 2003 mandate.

Mr. Ageloff has filed a series of applications, the majority of which remain undecided.  These requests include discovery requests of the government, requests of the Court for funds to help establish his defense, at least two motions to dismiss, and a request that the undersigned be granted permission to file an interim CJA voucher.  Mr. Ageloff also filed a petition for a writ of *mandamus* in the United States Court of Appeals for the Second Circuit. That petition was denied.

---

[1] A copy of the Writ is attached hereto.

Honorable Raymond J. Dearie
July 7, 2010
Page 2 of 2

The Court initially scheduled an evidentiary hearing for May 17, 2010 for the purpose of resentencing Mr. Ageloff. On or about May 11, 2010, the Court held a status conference, at which it announced that it was reconsidering Mr. Ageloff's eligibility for appointed counsel. It then scheduled an evidentiary hearing for June 1, 2010. The evidentiary hearing was held, the defendant testified, and the government presented no evidence. The Court has not ruled on its *sua sponte* motion to reconsider Mr. Ageloff's eligibility for assigned counsel.[2]

**Defendant's Request**

Defendant requests that the Court withdraw the Writ. Mr. Ageloff is currently serving an independent federal prison sentence and has a projected release date of December 11, 2013. Mr. Ageloff, a resident of Florida, was previously incarcerated at FCI Miami, near his 84-year-old father and his two daughters, who both miss him dearly. Furthermore, I am informed that the medical staff at the MDC in Brooklyn has recently found a tumor in Mr. Ageloff's body and Mr. Ageloff feels that any treatment he may need would be better secured at FCI Miami.

It is no secret that incarceration in a detention center is more onerous than detention at a correctional institution. As it appears that the Court will not soon resolve Mr. Ageloff's matter, he asks that the Court withdraw the Writ and permit the Bureau of Prisons to redesignate him to a facility closer to home, his family, and where he can receive the proper treatment for his tumor. Mr. Ageloff is willing to waive any and all rights he has to be physically present for his restitution resentencing hearing in light of his request to return home.

If the Court has any questions, please have a member of the Court's staff contact me at any time.

Respectfully submitted,

**The Law Offices of Scott L. Fenstermaker, Esq.**

By:   *Scott L. Fenstermaker*

Scott L. Fenstermaker, Esq.

cc:   AUSA Dan Spector (via ECF)
        Mr. Roy Ageloff (via first class mail)

---

[2] On May 18, 2010, Mr. Ageloff sought permission to file a motion seeking release of his funds currently being held by the clerk of the court. The Court did not rule on Mr. Ageloff's request to file a motion, instead directly denying Mr. Ageloff the ability to secure release of his funds by Order dated May 19, 2010 without hearing argument or receiving briefing. Defendant filed a May 27, 2010 motion seeking reconsideration of the Court's May 19th Order denying the release of his funds. The Defendant's motion to reconsider has not been addressed.

Eastern District of New York

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 09 2009 ★

BROOKLYN OFFICE

**APPLICATION FOR WRIT OF HABEAS CORPUS**
UNITED STATES DISTRICT COURT

---

UNITED STATES OF AMERICA

- against -

ROY AGELOFF

_____
Defendant.

☒ file no. CR-98-1129
☐ Criminal Miscellaneous

The undersigned ☒ Assistant U.S. Attorney ☐ Special Attorney hereby applies to the captioned court for the issuance of a writ of habeas corpus ☐ ad prosequendum ☐ ad testificandum ☐ in re a motion pursuant to 28 U.S.C. § 2255 and avers:

1. Name of detainee (and detainee number, if known): ROY AGELOFF
USMS# 57431-053      ORANGE COUNTY JAIL #09021855

2. Detained by ☐ Warden, New York Metropolitan Correctional Center, New York, New York
☐ Warden,
☒ Other:   ORANGE COUNTY JAIL - 3023 39TH STREET - ORLANDO, FLORIDA 32839-8694
[Specify title of custodian and name and location of detention facility]

3. Detainee is ☐ charged in this district by ☐ Indictment ☐ Information ☐ complaint with,
OR ☐ was convicted in this district of, violating Title 18 , U.S.C. § _____ , OR ☐ is a witness not otherwise available by the ordinary process of the Court.

4. Appearance is necessary on NOVEMBER 12, 2009 @ 3 PM , at _____ o'clock P M ☒ in
Courtroom Number 10A ,OR ☐ before the Federal Grand Jury sitting in Room Number _____ , of the United States Courthouse for this district, for ☐ arraignment ☐ plea ☐ trial ☐ sentencing
☐ in re a motion pursuant to 28 U.S.C.§ 2255 ☐ the purpose of giving necessary testimony in the captioned proceeding
☒ other purpose(s), specifically   BEFORE THE HONORABLE RAYMOND J. DEARIE

VIOLATION OF SUPERVISED RELEASE HEARING

---

Sworn to before me this
9th day of October

2009 LINDA J. McNEILL
Notary Public, State of New York
No. 01MC6017505
Qualified in Kings County
Commission Expires 12/14/20 10

☒ Assistant United States Attorney
Eastern District of New York
☐ Special Assistant United States Attorney

718-
254-
6297
JONATHAN GREEN

**WRIT OF HABEAS CORPUS**

☒ Ad Prosequendum          ☐ Ad Testificandum          ☐ In Re Motion to Vacate

The instant application is granted and the above-named custodian, as well as the United States Marshal for this district, his deputies, and all other United States Marshals and their deputies, is and are each directed to produce the named detainee, in civilian clothes, on the date, at the time, and in the place recited above; and thereafter to maintain the said detainee within the jurisdiction of this Court pending the satisfaction of this writ or the further orders of the Court.

Dated:      New York   Brooklyn, NY
      , 20      Oct 9, 2009

ROBERT C. HEINEMANN
CLERK E.D.N.Y.

_____
Deputy Clerk

A TRUE COPY
ATTEST
DATE 10/9 20 09
ROBERT C. HEINEMANN
CLERK
BY _____ DEPUTY CLERK

U.S.M.J.

<u>CERTIFICATE OF VIRUS SCANNING</u>

It is hereby certified that the PDF version of this document has been scanned by Trend Micro Office Scan Version 7.3 for viruses and no virus has been detected.


Dated:    Brooklyn, New York
          April 19, 2012


                                    /s/
                         _____
                         Wendell Bennett
                         Legal Assistant
                         Appeals Division